UNITED STATES of America, by John N. MITCHELL, Attorney General, Plaintiff,

v.

JACKSONVILLE TERMINAL COMPA-NY, a corporation, et al., Defendants.

No. 68–239–Civ.–J.

United States District Court,
M. D. Florida,
Jacksonville Division.

May 5, 1970.

Order on Costs April 16, 1970.

568

William B. Fenton, Atty., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Luke G. Galant, Dawson, Galant, Maddox, Boyer, Sulik & Nichols, William H. Adams, III, Guy O. Farmer, II, Mahoney, Hadlow, Chambers & Adams, Delbridge L. Gibbs, Marks, Gray, Conroy & Gibbs, Jacksonville, Fla., E. Smythe Gambrell, Harold L. Russell, Lloyd Sutter, and William O'Callaghan, Gambrell, Russell, Moye & Killorin, Atlanta, Ga., Clarence M. Mulholland, Richard R. Lyman, Mulholland, Hickey & Lyman, Toledo, Ohio, William J. Hickey, Washington, D. C., Donald Bennett, Harold A. Ross, Robert Hart, Cleveland, Ohio, William J. Donlon, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCOTT, District Judge.

### I. STATEMENT OF THE CASE

A. *Nature of the Case.*

This is an action filed by the Attorney General of the United States [1] ("the Government") under Title VII of the Civil Rights Act of 1964 ("the Act"), 42 U.S.C.A. § 2000e et seq., alleging that the defendants Jacksonville Terminal Company ("the Company") and sixteen (16) named international labor organizations (the "unions" or the particular union) [2] are engaged in a pattern or practice of resistance to the full enjoyment of the rights of Negroes to equal employment opportunities and that this alleged pattern or practice is of such a nature and is intended to deny Negroes the full exercise of rights secured by Section 703(a), (c), (d) of the Act, 42 U.S.C.A. § 2000e–2(a), (c), (d).

B. *General Contentions of the Parties.*

From a review of the complaint, the answer and amendments thereto including affirmative defenses raised by the Company, the pre-trial stipulation filed pursuant to Rule 10(D) of the Rules of this Court (and later admitted into evi-

1. Suit was brought by then Attorney General Ramsey Clark on June 24, 1968. Pursuant to an order of this Court, dated March 6, 1970, Attorney General John N. Mitchell was substituted as statutory plaintiff.

2. Brotherhood of Railroad Trainmen (BRT) and Brotherhood of Locomotive Firemen and Enginemen (BLF&E) (now affiliated with the defendant United Transportation Union (UTU)); Railroad Yardmasters of America (RYA); Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC) and Transportation-Communications Employees Union (TCU, which is now affiliated with BRAC); Brotherhood of Locomotive Engineers (BLE); Brotherhood of Maintenance of Way Employees (BMWE); American Railway Supervisors Association (ARSA); Brotherhood of Railroad Signalmen (BRS); International Association of Machinists and Aerospace Workers (IAMAW); International Brotherhood of Electrical Workers (IBEW); International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (Boilermakers); Sheetmetal Workers International Association (SMW); Brotherhood of Railway Carmen of America (BRCA); International Brotherhood of Firemen, Oilers and Helpers (IBFO); and System Federation No. 50 of the Railway Employees' Department, AFL–CIO (System Federation No. 50, RED, or "shopcrafts"; the joint bargaining agent for the IAMAW, IBEW, Boilermakers, BRAC, SMW, and IBFO).

dence as Joint Exhibit No. 1), the pretrial briefs submitted pursuant to Rule 10(E) (2) of the Rules of this Court, the transcript of the pre-trial conference of January 6–7, 1970, and the arguments and statements of counsel (including the various memoranda in support thereof) during the course of the seven-week trial, the general contentions of the respective parties are clear. The Government contends as follows:

(1) The defendant Company is engaged in acts and practices which limit, segregate, classify or otherwise discriminate against its Negro employees in ways which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of their race.

(2) All of the defendant unions have entered into collective bargaining agreements with the Company, and each such agreement contains provisions which perpetuate, or tend to perpetuate, the effects of certain of the discriminatory acts and practices of the defendant Company.

(3) The defendants BRAC and BMWE maintain racially segregated locals which deprive Negro members of employment opportunities and adversely affect their status because of their race.

(4) That such acts and practices of the Company and the defendant unions constitute a pattern or practice of resistance to the full enjoyment of the rights of Negroes to equal employment opportunities, and that this pattern or practice is of such nature and is intended to deny the full exercise of the rights secured by Section 703(a), (c) and (d) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a), (c) and (d).

The Company has answered as follows:

(1) The Company denies that it is engaged in acts and practices which limit, segregate, classify or otherwise discriminate against its Negro employees in ways which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of their race.

(2) The Company denies that the collective bargaining agreements it has entered into with the defendant unions contain any provisions which perpetuate or tend to perpetuate the effects of any discriminatory acts and practices.

(3) The Company denies that its acts and practices constitute a pattern or practice of resistance to the right of Negroes to the full enjoyment of equal employment opportunities, and that this pattern or practice is of such a nature and is intended to deny the full exercise of the rights secured by Section 703(a), (c) and (d) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a), (c) and (d).

(4) The Company denies each and every allegation contained in paragraphs 7, 9 and 10 of the Government's Complaint.

(5) The Company interposed the following affirmative defenses in an amendment to its Answer, filed September 4, 1969:

(a) Any preferences, distinctions and differences among company employees with respect to compensation or terms, conditions or privileges of employment result from (a) standards fixed pursuant to bona fide seniority systems; (b) the work content and classifications of positions or operating requirements of the Company; and (c) determinations with respect to (a) and (b), *supra,* made by Federal boards or agencies pursuant to the Railway Labor Act, 45 U.S.C. § 151 et seq.; furthermore, such preferences, distinctions and differences are *not* the result of any intention, *past or present,* to discriminate because of race, color, religion, sex or national origin.

(b) Any written or oral tests used by the Company were developed by professional railroad supervisors to measure ability to perform satis-

factorily in certain specific job classifications; and such tests, their administration, and action taken upon their results are *not* designed, intended or used to discriminate because of race, color, religion, sex or national origin (see Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(h)).

(c) By virtue of Section 703(j) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(j), the Company is not required to grant, and is prohibited from granting, preferential treatment to any individual or to any group because of the race, color, religion, sex or national origin of such individual or group in order to eliminate any "imbalance."

(6) The Company further submitted the following:

(a) As to work done by Negroes, compensation or terms, conditions or privileges of employment are equal to that received for similar work (as done by whites or any others) on other railroads anywhere in the country;

(b) The Company gives its Negro employees employment benefits superior to those Negroes receive elsewhere in the Jacksonville, Florida area; and

(c) The Company affords its Negro employees employment opportunities and benefits equal or superior to the employment opportunities otherwise available to them outside the Company.

(7) The Company [3] also contends [4] that—

(a) Evidence of employment acts and practices which occurred prior to July 2, 1965, the effective date of

Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., is irrelevant, immaterial and incompetent, and therefore, inadmissible in this action; and

(b) The Government has the burden of proving by the preponderance of evidence that defendant intentionally committed *specific* acts and practices violative of Section 703 of the Act, 42 U.S.C.A. § 2000e–2, subsequent to July 2, 1965, the effective date of Title VII, of such a nature and number as to constitute a "pattern or practice" of racial discrimination such as contemplated by Section 707(a), 42 U.S.C.A. § 2000e–6(a).

The defendant unions deny that:

(1) the collective bargaining agreements each has entered into with the defendant company contain any provision which constitutes an act or practice proscribed by the Civil Rights Act, or is so intended;

(2) such agreements contain any provisions which perpetuate, or tend to perpetuate, the effects of any alleged discriminatory acts or practices of the Company;

(3) each is engaged in acts or practices which constitute a pattern or practice of resistance to the full enjoyment of the rights of Negroes to equal employment opportunities secured by the Act or which are intended to deny the Negroes the full exercise of such rights;

(4) any provision of any of said collective bargaining agreements in and of itself constitutes an act or practice proscribed by the Act; and

(5) any act or practice engaged in by the Company pursuant to, be-

---

3. The union defendants joined with the Company with respect to these contentions.

4. In its memorandum in Support of Its Motion to Dismiss herein, filed with the Court February 16, 1970, the Company urged (i) that Constitutional considerations preclude action in this case which

would destroy or diminish accrued seniority rights of Company employees and (ii) that individual employees whose seniority rights would be adversely affected are indispensible parties and should be identified and joined as parties. In view of the Court's disposition of other issues herein, it is not necessary to pass upon those contentions.

cause of, and in compliance with any provision of any of said agreements constitutes an act or practice proscribed by the Act.

The defendants BRAC and BMWE also deny that they maintain racially segregated locals in a pattern or practice of resistance to the rights of Negroes to the full enjoyment of any of the rights secured by Section 703(a), (c) and (d) of the Act, and that the pattern or practice is of such a nature to and is intended to deny to Negroes the full enjoyment of rights secured by the Act.

### C. *Pre-trial Proceedings.*

This action was filed on June 24, 1968, by the Government. During the ensuing 19 months prior to trial, the Government undertook through extensive discovery and investigative procedures the accumulation of facts to support its allegations. The Government filed and served upon the various defendants 15 sets of interrogatories and 10 sets of requests for admissions. Depositions of 11 Company officials and employees and six officers of the unions were taken. Pursuant to a motion to produce, the Government counsel were given access to files of the Company and files of the various union defendants. Copies of thousands of documents found in the files of the various defendants were obtained by the Government.

Defendants propounded 6 sets of interrogatories and 2 sets of requests for admissions.

In view of the protracted nature of this litigation and the lengthy discovery activity, two pre-trial conferences and three other hearings were conducted by the Court prior to trial.

### D. *Final Pre-trial Conference.*

On January 6–7, 1970, the second and final pre-trial conference was held in Jacksonville. In accordance with the provisions of local Rule 10(G) (1), the Court incorporated the pre-trial stipulation into the conference transcript and treated the transcript as a pre-trial order. The Court ruled on a number of motions and objections raised and argued by counsel, including: (1) whether the Government has the burden of proving by the preponderance of evidence that the defendants intentionally committed *specific* acts and practices violative of Section 703 subsequent to July 2, 1965, such as to constitute a "pattern or practice" of racial discrimination within the compass of the proscriptions of Section 707(a), and (2) whether evidence of employment acts and practices which occurred prior to July 2, 1965, the effective date of Title VII of the Act, would be inadmissible as irrelevant, immaterial and incompetent to constitute or to prove post-Act racial discrimination.

The Government repeatedly assured the Court that it would prove *specific* post-Act acts of racial discrimination (transcript of pre-trial conference, pp. 40–41, 63, 77, 81, 163–164, 256; hereinafter "T") as required by Title VII. The Court, adopting Government counsels' own conclusion (T. 164), held that the question as to evidence of matters occurring prior to July 2, 1965 "is moot, at least for the time being, because the Government advises that they intend to prove specific acts and practices violative of Section 703 of the Act." (T. 173) The Court later held: "You [Government counsel] volunteered to prove specific acts, so the Court takes you up on that and you'll have to prove specific acts * * * "

There was no dispute that the proper standard of proof was a preponderance of the evidence as to acts and practices of the defendants alleged to be violative of the Act.

The Court, with respect to the admissibility of pre-Act acts and practices and evidence thereof, explained (T. 269–70):

"[Pre-Act] evidence of employment acts and practices will be admissible provided it is connected up with testimony that shows the employment acts and practices, which apparently the Government thinks that they will be able to prove are discriminatory, con-

tinued after July 2, 1965; and if evidence isn't forthcoming to show that those employment acts and practices that the Government is able to prove prior to July 2, 1965, continued after the effective date of the Act and established a pattern or practice continuing after the effective date of the Act, then the Court would strike the testimony at the conclusion of the Government's case.

"But initially, it will be admissible on the Government's assertion that it will be connected up with testimony to show the practices were in effect after July 2, 1965; is that correct, Mr. McBroom [Government counsel]?

"Mr. McBroom: That's correct, Your Honor."

The Court held, in short, that the Government would be required to prove *specific* post-Act acts and practices of racial discrimination; and, in order to do so, the Government would be permitted, subject to objection, to introduce evidence of pre-Act matters to explain alleged post-Act discriminatory employment acts or practices. (T. 273–276). The Court has carefully considered and evaluated all of the evidence relating to alleged racial discrimination prior to and subsequent to the effective date of the Act. The Court finds that the Government failed to prove racially discrimina-

tory acts and practices prior to or after the effective date of the Act.

The Court also considered during the pre-trial hearing Government contentions with respect to possible Company liability for backpay to certain Negro employees who allegedly were not paid at overtime rates for certain work performed. The Court did not exclude such issue even though there was no allegation in the Government's Complaint with respect thereto, and even though it had doubtful significance as to the issues in the case.

### E. *Trial.*

The trial began January 19, 1970, and consumed 27 working days over a seven-week period. The Court heard testimony of 42 witnesses, in person or by deposition, during the Government's case-in-chief,[5] from 19 witnesses called by defendants[6] during presentation of their defense, six witnesses[7] called by the Government on rebuttal, and one Company witness[8] called in surrebuttal.

### II. GENERAL FINDINGS

1. The Company is incorporated under the laws of the State of Florida and is engaged in the operation of an interstate railroad pursuant to the Interstate Commerce Act, 49 U.S.C. § 1 et seq. The Company is jointly owned by three railroads: Seaboard Coast Line Rail-

5. The Government called 25 Negroes who were or had been Company employees (one was also a local union official), nine whites who were or had been employees (four of whom were or had been local union officials), and seven company officials (one of whom was recalled at three different stages of the Government's case).

6. The Company called six present or past Company officials (including its President and General Manager), four officers of the owner railroads (including two who are members of the Terminal Company Board of Directors—the President of Seaboard Coastline Railroad Company and the General Manager, Eastern Lines, of Southern Railway Company—as well as two who were labor relations officers with the previously mentioned railroads).

The unions called six international union officers and two officers of local lodges of the organizations.

One expert in the field of the evaluation, operation and application of collective bargaining agreements in the railroad industry (Mr. James E. Wolfe) appeared jointly on behalf of all defendants.

7. The Government in rebuttal called the Company's President and General Manager and one department head, two Negro employees (one was a foreman and the other had testified during the Government's direct case), one white former foreman (who had also testified during the Government's direct case), and a reputed expert on employment testing.

8. The Company called an industrial psychologist to meet certain issues raised by the Government on rebuttal.

road Company (formerly the Seaboard Air Line Railway Company and the Atlantic Coast Line Railroad Company) which owns 50 percent of the corporate stock and the Southern Railway Company and Florida East Coast Railway Company each holding 25 percent of the stock. These owning railroads elect a Board of Directors which establishes general policy, but leaves the day-to-day operation to a President and General Manager, who is the Chief Executive Officer of the Company. The Company owns and operates the railroad terminal in Jacksonville, handling passenger service, freight interchange, United States Mail distribution, preventive and corrective maintenance on Seaboard Coast Line rolling stock (and rolling stock of such other railroads as may from time-to-time be required), and such other matters as are necessary for the safe, economical and efficient operation of the terminal facility in all of its functions.[9]

The Company has established, and operates through, various departments common in railroad operations. Positions in each such department are similar to those found in comparable departments of any other railroad engaged in interstate commerce as authorized under the Interstate Commerce Act. Such positions range from engineer and hostler helper in engine service; to conductor and switchman in train service; electrician, machinist, carmen and their helpers and apprentices, in the so-called shopcrafts work; carpenter, painter, welder, and their helpers in maintenance of way; accountants, clerks, redcaps, baggage and mail supervisors and their helpers in various departments; and general laborers throughout all departments, to name but a few job classifications common to the Company and to the railroad industry.

2. The 16 union defendants herein are standard railway labor organizations (national or international), each of which is certified by the National Mediation Board as the collective bargaining representative of a craft or class of employees separately represented on the property of the Company and subject to the obligations and duties imposed by the provisions of the Railway Labor Act, 45 U.S.C. § 151 et seq. All employees (other than officers and appointed officials) of the Company are represented by one of the union defendants in the negotiation and administration of rules relating to their employment.

3. The Company and each of the defendant unions, pursuant to the provisions of the Railway Labor Act, have entered into collective bargaining agreements, copies of which are contained in Government Exhibit 8. In addition, the Company and the respective unions are parties to certain other nationally negotiated agreements covering, *inter alia*, wages, fringe benefits, and job protection.

4. As of August 6, 1969, the Company had approximately 532 employees, a decline from a 1953 work force of approximately 1,200 employees. Of these 532 employees some 275 were white and some 257 were Negro. Approximately 50 of the 532 employees did not work full time; rather, they filled vacancies or temporary assignments as needed. The foregoing figures do not reflect employees on leave of absence or furloughed employees who did not work actively. The Company's annual passenger train volume has decreased from 35,000 in 1944 to 10,000 in 1969; annual operating expenses have dropped from $4.9 million in 1960 to $2.3 million in 1969. Losses were $5.5 million in 1960 and $2.9 million in 1961.

The Company, as a result of declining volume of operations, and to a certain extent as a result of mechanization, has substantially contracted its work force. As a corollary of the declining work

---

**9.** The Company is subject to the Railway Labor Act, the Interstate Commerce Act, the various safety regulations promulgated by the Interstate Commerce Commission, the Federal Employers' Liability Act, the Safety Appliance Act, the Standards of the Association of American Railroads and its own rules and regulations.

force, job vacancies and promotional opportunities have in general been minimal while reductions in force have occurred regularly. This contraction in the Company's business and corresponding reduction in manpower is not unlike that experienced by the railroads nationwide.

5. Having carefully observed the appearance and demeanor of each of the witnesses, appraised the credibility, nature and substance of their testimony and evaluated the materiality and relevancy of such testimony, having accorded proper weight to the contents of each of the evidentiary exhibits (in its consideration of all issues) and having been informed upon and considered persuasive prior judicial articulation, the Court finds that the Company's practices and policies regarding initial job assignment and promotions, as well as other employment practices and the effectuation and implementation of the provisions of the Company-union collective bargaining agreements, have at all material times been applied equally and without regard to race as to each and every employee. There has been no showing that any practice or policy has been established or maintained for the purposes of effecting or perpetuating any racial discrimination in employment.

6. The Court received into evidence, subject to objections of defendants,[10] 38 Government exhibits[11] and 19 defendants' exhibits, one Joint Exhibit (the pre-trial stipulation), and one exhibit of the Court. In addition, the Court heard extensive oral argument on defendant's motions to dismiss,[12] pursuant to Rule 41(b), made at the close of the Government's case and further argument at the close of all the evidence.

The Court, on March 4, 1970, announced the following conclusions:

"[T]he Court finds from an evaluation and consideration of all the evidence in this case, that the Government has completely failed to prove its case against these defendants or any of them as to each and every one of the issues in this case by a preponderance of the evidence.

"The Court also finds from a consideration of all the evidence, that the defendants and each of them have completely proved by a preponderance of all the evidence that the Government is not entitled to prevail on any of the issues raised by the Complaint and answers of the several defendants, including the affirmative defenses stated therein.

"The evidence has also shown that the Government is not entitled under the evidence and the applicable law, to the injunctions, either temporary or permanent, as prayed for in the Complaint."

These conclusions relate to all of the allegations, claims, contentions and issues whether raised by the pleadings, the pre-trial stipulation or during trial, and they are hereby reiterated.

10. The defendants were permitted to interpose a running line of objections to the admissibility of evidence of pre-Act (pre-July 2, 1965) matters based upon the Court's rulings made at the pre-trial conference.

11. These exhibits included charts depicting the organization and pay-scale levels of the Company, collective bargaining agreements between the Company and the defendant unions, the constitutions and by-laws of said unions and numerous items of correspondence and other written matter, some of which dated back to 1930.

12. Defendants, in addition to oral argument on February 16–18, 1970, filed three written briefs (one by the Company, one by the BLE, and one by the unions other than the BLE) totaling over 170 typewritten pages. The Government also filed a memorandum brief. These briefs were carefully reviewed by the Court. In the exercise of one of the prerogatives granted the Court under Rule 41(b), and in conformity with the spirit of rulings of the Court of Appeals for the Fifth Circuit, the Court declined to rule on the motion pending receipt of all evidence.

## III. FINDINGS AS TO THE DEFENDANT COMPANY

### A. *General.*

1. The Court heard testimony with respect to each person hired or promoted since the effective date of the Act. The Court is impressed with the honest, good faith efforts of the Company and all of its officers and department heads in achieving compliance with the mandates of the Act and provisions of Executive Orders dealing with equal employment opportunity. The Court finds that, based on all the evidence before it, the Company sought, with respect to each and every person hired or promoted since the effective date of the Act, to obtain the best qualified person then available for the job (including some who also possessed seniority rights entitling them to the job). The Court finds that the Government failed to prove that any Negro not hired or promoted possessed qualifications equal to or greater than those possessed by persons hired or promoted. The Court finds no qualified Negro was denied promotion because of his race.

2(a). This Court heard the testimony of four officers of the railroads which own the Company and elect a majority of its Board of Directors, including the President of the Seaboard Coast Line Railroad Company. Their position was clear: the Company was instructed to comply with the letter and spirit of Title VII and to insure that its personnel policies were racially non-discriminatory. In addition, the Company's President and General Manager, who as Chief Executive Officer is principally responsible for establishing and maintaining Company policy and implementing the directives of the owner lines, testified credibly that he had worked in various supervisory and executive capacities for 30 years with the Alton & Southern Railway Company, and that he had never practiced racial discrimination and had no intention of engaging in racial discrimination when he came to the Company in February, 1967. The Company's Depart-

ment heads and all employees knew and adhered to his position as the result of conferences and memoranda (some of which are evidentiary exhibits). Likewise, the Court heard the testimony of the Company's Manager of Personnel and Claims who appeared on the stand four separate times during the presentation of the Government's case and who was subjected to thorough and sifting examination on all aspects of the Company's personnel practices and policies. That officer established the Company's intent to comply fully with the Act. He testified as to every personnel action taken since the effective date of the Act and showed that the Company took all such actions solely on the basis of Company needs and individual qualifications. Similarly, department heads and key supervisory personnel testified forthrightly concerning all actions taken in their respective areas of responsibility. Moreover, various labor representatives testified that they and their respective organizations provided fair and equal representation for all members of their crafts, regardless of race. The testimony of the foregoing witnesses fully establishes that the Company has at all material times intended to comply with the Act and in fact has so complied.

2(b). The above testimony is supported by the actions of the Company. All persons, Negroes included, have been informed that the Company is an equal opportunity employer, and its employment policies have been communicated to the local colleges which have large Negro student bodies and to the Jacksonville Urban League. Beginning in 1961 or 1962, notices that the Company is an equal opportunity employer were posted on bulletin boards in all departments at the Company, and those or similar notices have been posted on such bulletin boards continuously since. On June 24, 1965, all of the Company's department heads were informed by memorandum from the President and General Manager that the Company intended to comply with the Act (which was then about to become effective as to the

Company) and that the Company would continue its then existing practice of affording equal employment opportunity to all. Moreover, Negro employees have been promoted into the better paying jobs, although the Company's state of contraction has reduced the available opportunity for promotion for all employees.

2(c) The Deputy Contracts Compliance Officer of the Post Office Department advised the Company on July 1, 1965 (one day before the effective date of the Act) that the Company's actions to "afford equal employment opportunity to its employees without regard to race, creed, color or national origin" had resolved outstanding complaints. The Company was also advised "that the Post Office Department will continue to evaluate the progress of the Company in achieving full compliance with the Executive orders on equal employment opportunity." The Company has cooperated with the Federal agencies responsible for effecting equal employment opportunity and no such agency (nor any person) has lodged any complaint with the Company since July 1, 1965.

2(d) The Company is a Federal contractor subject to the requirements of Executive Order 11246 and regulations of the Secretary of Labor adopted pursuant thereto. In May, 1968, the Secretary adopted a requirement (Fed.Register, Vol. 33, pp. 7804–12, May 28, 1968) that all contractors formulate, file and adhere to "affirmative action compliance programs" and undertake thereunder affirmative action with respect to its hiring practices, recruitment, testing, upgrading, transferring and promotion, concentrating upon utilization of minority group personnel, and make reports to its Contract Compliance Officer with respect thereto. The requirements of an affirmative action program, which is directed toward increased utilization of minority group personnel in employment, are broader and more sweeping than simple compliance with the Civil Rights Act.

In October, 1968, the Company formulated and filed with the Post Office Department, Deputy Contract Compliance Officer, the required affirmative action compliance program. The Company pointed out that it had notified and would continue periodically to notify sources of employee recruitment that it is an equal opportunity employer and solicits referral of all qualified applicants without regard to race; that it had posted notices required or requested by all Federal agencies of its status as an equal opportunity employer; that it has issued to its supervisory and management personnel information as to the requirements of the civil rights laws and of the Company's affirmative policy of compliance with respect thereto; that it had periodically reviewed with its staff and employees its equal opportunity and affirmative compliance programs; that it had notified all labor organizations of its policy; that it had completely eliminated segregation and discrimination in the use of toilets, wash rooms, locker rooms, drinking fountains, eating establishments, time clocks, and other Company provided facilities; that it had cooperated with the Contracts Compliance Officer of the Post Office Department fully and would continue to do so; that it had otherwise taken affirmative steps to assure equal opportunity in employment at the Company; and that it was then establishing upon the property of the Company an equal opportunity board, consisting of management and employee personnel, white and Negro, to monitor and review the Company's affirmative compliance program, to make recommendations and suggestions and to assure that the Company is better able to implement its policy of promoting from within its ranks wherever possible. This program was made fully known to the employees of the Company.

The Company's action as summarized in the preceding paragraph and its affirmative action in seeking increased and enhanced utilization of minority group employees make it plain that the Com-

pany does not have an intention to violate the Civil Rights Act nor to establish or maintain any patterns, practices or acts of racial discrimination.

2(e). On the basis of all the evidence, including that discussed above and including the Court's observation of the appearance and demeanor of the witnesses and their high standing in the community (as well as the high standing of the Company), the Court finds that the Company has not intentionally engaged in any act or practice constituting racial discrimination in violation of Title VII. The Company has exhibited by its words and actions intent to comply with the Act and applicable fair employment practice regulations. The Court finds that the Government has failed to show any intent by the Company to engage in racial discrimination in employment or any factual basis from which to infer such intent.

3. With respect to employment practices in the Accounting sub-department, the Ticket Department and the Signal Department, no evidence of racially discriminatory practices was offered and no finding of such practices in those Departments can be made.

4(a). Wage rates for Company employees are set by carrier-union agreements negotiated on a nationwide basis. Company employees in the lower paying jobs earn substantially more than the national minimum wage and the wage levels prevailing elsewhere in the Jacksonville area. Wage rates reflect the level of skills required of incumbents in each job (both nationally and, *ex machina,* at the Company). The greater the skills and qualifications of an employee in his job, the more money he is assured and paid under the nationally-negotiated agreements. Negroes and whites performing work in the same job classifications receive the same pay. As pointed out below, there are no artificial or superficial job classifications at the Company. The Court accordingly finds that whites and Negroes similarly situated are treated in the same manner with respect to pay.

4(b). The only attempts to show otherwise were directed at the payment of straight time rates for overtime worked and the payment of the Carman's rate to Carmen who blank or cut steam hose while Carman Helpers receive the Helper's rate therefor. The record shows that both whites and Negroes were paid (in connection with some vacation relief work) straight time rates for overtime worked. The practice was completely lacking in any racial motivation or overtones, and it was terminated in mid-1969 after union complaints (according to the admission of the only complaining witness on this subject). With respect to blanking and cutting steam hose, the defendants' expert, Mr. Wolfe, testified that the 1956 Company-union agreement simply permits both Carmen and Carman Helpers to perform an *unskilled service* on passenger cars, which does not appear in the Carmen's classification of work rule, depending on who is available to do the work at the time it needs to be performed. Moreover, he noted that there is provision in the classification of work rules for Carmen Helpers for them to repair steam and air house. This provision, according to Mr. Wolfe, is the closest to an express mention of the subject of uncoupling hose; and it would indicate that if a Helper can repair steam hose, the disconnection of such hose is within his work classification. More to the point, however, there was no racial motivation or overtone underlying the Company-union agreement to classify this as work capable of being performed by Carmen or Helpers depending upon who may be available at a particular time and in not establishing special pay scales for the work.

5. There are 32 locker, shower and/or toilet facilities on the Company property. There is no evidence that the Company has at any material time required, assigned or provided for the use of such facilities on the basis of race. Rather it is clear that each such facility is utilized by employees working in the area proximate to it and generally on a craft, class

or job classification basis. Many such facilities are used by both Negroes and whites. The Court finds that employment opportunities have not been and are not affected by the use of such facilities.

6. Each department, sub-department, craft, class and job classification at the Company serves a functional purpose separate and apart from every other department, sub-department, craft, class and job classification. Moreover, each such classification is important to the Company, its employees and the traveling public in view of the factors of safety, economy and efficiency which are inherent therein. The record is devoid of any proof that race was a factor in the organization of any department or sub-department, the selection of employees therein, the creation and maintenance of the craft and class system of seniority or the classification of jobs. To the contrary, the record shows that the departments, sub-departments, crafts, classes and job classifications have been created for functional, supervisory and business purposes directly related to the safety, efficiency and economy of operation of the Company. There are no artificial or superficial job classifications at the Company and there are no "Negro jobs" or "white jobs" at the Company. There is no evidence that any job classification was created or maintained with the intent to discriminate against Negroes or operates to the detriment of Negroes because of their race.

The departments, sub-departments, crafts, classes and job classifications at the Company are not unique to this Company. They are substantially the same as those existing throughout the railroad industry.

7(a). The only formal training programs offered by the Company have been apprenticeship programs in the mechanical crafts. These programs are not currently in use. The state of contraction of the operations of the Company and its continuing losses have affected the need for, and ability to implement, such programs. There has been no showing that Negroes have been denied employment as apprentices because of their race. There is evidence, moreover, that Negro applicants for other jobs have been informed of openings in apprentice positions and declined employment therein.

7(b). There has been no showing that age limitations imposed until the passage of the Age Discrimination Act of 1968, 29 U.S.C. § 621 et seq., were implemented, designed or continued with the intent to deprive Negro employees of the opportunity to become apprentices because of their race.

8(a). The record reflects that on-the-job training is available in some of the jobs at the Company. There is no proof, however, that whites and Negroes have been treated disparately with respect to opportunities to train on the job. Rather, the record shows that certain basic qualifications are prerequisites to obtaining all jobs and that persons who do not possess these qualifications (whether white or Negro) are not employed in those jobs. There has been no showing that on-the-job training has been applied to the benefit of any employee or not applied to the detriment of any employee because of race. Rather, the record is clear that on-the-job training at the Company is simply a means by which employees qualified in certain respects become oriented to their new environment.

8(b). The record shows that only a few jobs at the Company provide training for other jobs. It is in these limited number of situations that service in one job accrues seniority rights to bid on a better job, a right given to the employee because of the certainty that he will be trained for the better job by service in the lower-rated job. In this respect, the Court notes that the record shows these practices of the Company are not racially motivated, are predicated upon economy, efficiency and safety of operation and are like the practices of railroads nationwide which are administered without regard to the racial components of the various labor forces.

9. No issue with respect to the failure or refusal to hire Negroes is involved herein. The record shows that 257 of the Company's 532 employees (as of August 6, 1969) were Negro. The record does not show that any person has been denied employment by the Company because of his or her race.

10. The central argument of the Government has involved the initial job assignments and advancement opportunities of Negro employees, and, more specifically, whether the Company's policies and practices with respect thereto were, at any material time, intentionally created, designed or continued for racially discriminatory purposes or effect.

B. *Initial Job Assignment.*

1. Initial job assignments of new employees have been governed by the proper needs of the Company (including the existence of job vacancies and the skills required of an incumbent in each such job) and the qualifications of the prospective employee. The Company has employed the best qualified person available at the time of a job vacancy. Race has not been shown to be a factor in initial job assignment. There has been no showing of disparate treatment of whites and Negroes possessing equal or like qualifications.

2. The record contains uncontradicted testimony that all applicants for jobs were informed of all vacancies for which they might have possessed the requisite qualifications and were considered therefor upon the basis of qualifications alone. The Court finds that such is and has been the practice and policy of the Company and that no employee or applicant has been shown to have been assigned to any job because of his race.

3. In making this finding, the Court has taken cognizance of the affirmative responses of five of the 25 Negro witnesses to the question whether they were "assigned" to the first job each obtained at the Company (see paragraph 4, text, and footnotes 20 and 37, *infra*). The Court has also considered the fact that

personnel files for these five Negroes indicate they received the job they applied for. Moreover, not one of these witnesses voiced any complaint about being "assigned" to any particular job, which of course they could have accepted or rejected.

4. Ten Negro employees in the Company's Baggage and Mail Department were called by the Government but only one suggested some arbitrary initial job assignment (as a Group 3 porter). That was Roderick Gray who went to the Company for a job at the instance of his father, Henry Young, who worked there as a Separator and who signed Gray's minor's release for work as a *porter*. Mr. Jones, General Baggage and Mail Agent, testified that Roderick Gray was given a job as Porter at the behest of his father who wanted some way to "keep him off the streets." The Court concludes from the demeanor and testimony of the witnesses and the content of pertinent exhibits that Mr. Gray actively sought the job he received and had no qualifications for any other job. There is no credible evidence that he or any other Negroes hired into Group 3 jobs were assigned to jobs because of their race.

5. Most of the Company's Negro employees hold jobs which are among the lower paying jobs at the Company. That fact alone cannot serve as a basis for a finding that the Company has racially discriminated in its employment practices. To the contrary, the record establishes that Negro employees have been employed in the best jobs available at the time of employment and for which they were qualified. Moreover, the record shows that railroads throughout the nation draw their laborers and service workers (the categories of jobs within which fit the railroad crafts and classes which the Government labels as "Negro jobs") from the manpower pool available. Several witnesses testified in this case that the manpower pool for these classes of workers in Jacksonville is predominantly Negro. The Court concludes that any "imbalance" in racial composition of

respective jobs at the Company stems from the labor pool available, and from which the Company drew, and was not the result of any racial discrimination by the Company.

C. *Advancement, Promotion and Transfer.*

1. The advancement, transfer and promotion of employees have been based upon the needs of the Company (including the existence of job vacancies and the skills required of an incumbent in each such job) and the qualifications of employees seeking the job, with consideration first being given to employees who may possess seniority entitling them to bid on vacant jobs. Race has not been shown to be a factor. There has been no showing of disparate treatment of whites and Negroes similarly situated.

2. The record does not show that any employee has been denied, because of his race, the opportunity to seek a better job through advancement, promotion or transfer, or that any person has, because of his race, been denied a better job.

3. The Company, through its officers and department heads, periodically reviews and considers the qualifications of its employees (Negro and white) to determine which employees can be advantageously utilized in better jobs; the Company is not a large organization, and the officers and department heads generally know the qualifications and abilities and changes therein of their employees. There have been relatively few job vacancies during the time material to the issues here and each such vacancy was filled, after consideration of the qualifications of employees (Negro and white) within the Company, by the best qualified person available with consideration being given to the rights of any employees possessing seniority entitling them by contract to bid upon the vacant job.

4. The Court notes the admission of the Government that it made no attempt to determine the qualifications of any white employee hired or promoted by the Company since July 2, 1965. The Government asserts that no such effort was necessary in view of its contention that Negroes allegedly were not even considered by the Company for the jobs to which the white employees were hired or promoted. The Government failed to produce evidence to support its allegation, and it was content to advance the argument that the absence of Negroes in some of the skilled jobs in and of itself proved the contention that Negroes were not considered for promotion and transfer.

Reliance upon a simple head count of Negroes verus white employees cannot satisfy the requirement of probative evidence to support a contention basic to the Government's case. Fundamentally, the Government rests its case upon an assumption that Negro employees were equally well-equipped as to skills and other qualifications as white employees but were treated differently and discriminated against solely because of their race.

The Government's failure or refusal to undertake a comparative evaluation of the entitlement to job vacancies of competing Negroes and whites, upon the basis of individual qualifications, leaves the record without probative evidence to support a critical facet of the Government's case. Government counsel stated that it would prove post-Act discriminatory acts and practices. Yet proof that whites were hired into jobs despite qualifications less or equal to those of competing Negroes was not produced.

In converse fashion, and supporting the Court's finding that the Government has failed to support its basic contentions, is the evidence adduced by the competent Company witnesses who passed upon and approved employment, promotion and transfer of the employees hired, promoted or transferred since July 2, 1965, in which the qualifications of each such employee were described. The record established that each employee hired, promoted or transferred possessed the requisite qualifications and supports the Company's position that the best

**582**

qualified person was hired, promoted or transferred to job vacancies.[12a]

The relative qualifications of white and Negro employees who may have been competing applicants for specific jobs at specific times would be necessary to establish that Negro employees possessed equal or greater qualifications but were not considered on account of their race while the white competitors were hired, promoted or transferred because of the racial factor. This Court cannot engage in conjecture and speculation. The record does not show that any qualified Negro has been denied promotion or transfer because of his race or that any qualified Negro has not been appropriately considered therefor. If qualified Negro employees were overlooked in favor of less qualified white employees, that fact could have been shown and established by probative evidence. The only probative evidence with respect to relative qualification of white and Negro employees was supplied by the Company, not the Government. That evidence fully refuted the Government's contention that Negroes had "not even been considered" and established that all personnel actions material hereto were controlled by the appropriate business needs of the Company and the qualifications of the individual or competing applicants. The record details the qualifications of the persons hired or promoted since the effective date of the Act and shows they are of such a nature as to establish the existence of a pattern of hiring and promoting the best qualified person available at the time for the job opening in question. Race has not been a factor in any Company personnel action material to this case.

The Court notes that its finding that the Government failed to establish one of its basic contentions (in not presenting evidence on qualifications) and the finding that the Company's showing that the best qualified persons were hired or promoted requires judgment in favor of the defendants. However, even if it were otherwise and the aforesaid findings were not made, the Court's other findings would require judgment for the defendants.

5. The Negro employees of the Company have had the opportunity, equally with white employees, to transfer from one job to any other job at the Company subject only to the existence of vacancies in such jobs and their qualifications therefor.

6. The Company has no rigid or mandatory "entry level" jobs or "lines of progression." Any job can be and has been an "entry level" job in the sense that a job applicant or an employee desiring transfer within the Company can, subject to job availability, be hired into or transferred to any job for which he possesses the requisite qualifications. Similarly, there are no jobs for which there is required, as a condition precedent, service in a lower job classification at the Company.

7(a). The Company has always posted bulletins concerning job openings in accordance with the particular provisions of the applicable collective bargaining agreement. Those provisions generally dictate where the notice is to be posted (either in a bulletin book or on a bulletin board), what the notice must state (generally a description of the particular job, the pay rate and the work

12a. For example, and focusing upon cases about which there was considerable discussion of record: (1) in 1967, J. W. Griffin was better qualified for the Stockman's job than Nathaniel Sears and got the job, whereas in 1969 Nathaniel Sears was the best qualified applicant and was awarded a vacant Stockman's job; (2) in 1967, J. F. Seaward was better qualified for the Carpenter Helper's job than George Gaskins, but, in 1969, George Gaskins was the best qualified applicant for the Welder Helper's job and got the job; (3) in 1967, G. B. Roberts was better qualified for the Welder Helper's job than Albert Collier, but, in 1969, Albert Collier was the best qualified applicant and got the Welder Helper's job; and (4) in 1969, William Malone (then a fuel oil pumper) and Eva Baumgartner (then a clerk) both applied for the job of Steno-Clerk in the Mechanical Department and Eva Baumgartner got the job because she was better qualified.

schedule, as well as other information called for by the applicable contract) and how long the notice should remain posted (usually from five to ten days). The contracts require only that such bulletins be posted to the craft or class of employees entitled to exercise seniority rights with respect thereto and they are the particular employees possessing contract rights to bid on the new position or vacancy.

Defendant's expert, Mr. Wolfe, testified that the Company's practices with respect to bulletining job openings were in accordance with the Company's contracts and that those provisions were consistent with those found in the contracts of other railroads throughout the Nation. Additionally, he testified that the contract bulletin requirements, including the fact that notices are posted only to those employees entitled to exercise seniority rights, originated with the standardized provisions of General Order No. 27 [12b] and the decisions of the United States Railroad Labor Board. That evidence is undisputed.

7(b). In addition to complying with bulletining requirements of the respective contracts, the Company unilaterally adopted on March 18, 1969, a policy of posting notices of *any* job opening on *all* bulletin boards and in all bulletin books. (Defendants' expert, commenting on company-wide bulletining, testified that, while such a practice might be feasible on a small property like the Company, it would cause chaos on a trunk line railroad.)

7(c). On the basis of the foregoing, the Court finds that there is no evidence that the practices of the Company with respect to bulletining were in any way intended, adopted or maintained (either before or after March 18, 1969) to deny or deprive any Negro of any job opportunity because of his race, or that such practices in any way adversely affected or affect the job opportunities of any Negro because of his race.

8. Tests have been used by the Company in connection with the filling of Group 1 jobs in its Baggage and Mail Department, Mechanical Department (shopcraft) apprenticeships and engine service jobs. The record shows that the Personnel Test in the Baggage and Mail Department is the only one given by the Company at any material time.

9. The record contains no complaint with respect to the apprenticeship and engine service tests; no allegation is made that anyone has suffered because of their use; and the record shows they are in the form in use throughout the railroad industry.

10. The test given by the Baggage and Mail Department was made an issue, but the qualifications measured by the test are those required for incumbents in the jobs for which tested. The test relates to actual job requirements and was designed by professional railroad personnel. The Government has failed to prove that the test was designed, created, implemented or administered with the intent to discriminate based on race. The record shows that it was developed to screen employees to determine who might possess the clerical qualifications necessary for Group 1 job classifications. Test scores were but one of a number of factors considered in determining which employees might be qualified for work in Group 1 jobs.

11. The Government presented a Dr. Barrett who was critical of how the Baggage and Mail test might be administered or graded, but the record contains no complaint from anyone on those points, and Dr. Barrett pointed to no instance of faulty administration or grading even though all test papers and grades were available to him.[12c] He also said the test was not "professionally developed" but he later admitted he was

---

12b. See page 594 for explanation of General Order No. 27.

12c. The Government witness conducted a "blind analysis" in that he never actually spoke to or worked with the personnel involved, and he did not view the mail handling operations of the Company.

not qualified to give such an opinion. Finally, he criticized the work of Dr. William Buel, the industrial psychologist, who had, on behalf of the Company, validated the test as being properly and appropriately job related. Dr. Buel testified later and effectively defended the results of his validation study. Upon the basis of all the evidence, and upon observation of the witnesses and their demeanor and forthrightness, the Court concludes that the Baggage and Mail test (i) is appropriate for the purposes used, (ii) was not racially designed or inspired, (iii) is not intended to result in any racial discrimination and does not so result, and (iv) no one has suffered any diminution of job opportunity because thereof.

12(a). The record shows that 95 percent of the mail entering or leaving the State of Florida is routed through the Baggage and Mail Department. Extensive paperwork and record keeping are required in connection with the handling of the mail, and the Company's revenue is dependent upon complete and accurate record keeping. The General Baggage and Mail Agent testified that 80 to 90 percent of the productive time of the Assistant Foremen and Foremen is spent in gathering data, making computations and completing various forms and reports. The Government called in rebuttal two witnesses who had worked as Foremen and who testified that from 25 minutes to three hours a day are required in clerical or "pencil" work by a loading or unloading Foreman. Each testified, however, that his entire working day was spent in the performance of duties listed in Rule 2(a) of the BRAC Agreement (duties performed by employees holding Group 1 jobs). In describing the nature of their work, moreover, each concentrated on the compilation of data and completion of forms. Government Exhibit 31 contains job descriptions which show that the burden of the work of Foremen and Assistant Foremen is clerical. Based upon its review of the evidence and its view [12d] of the operations of the Baggage and Mail Department, the Court concludes that the general nature of the work of the Foremen and Assistant Foremen is clerical, that a majority of the time of persons holding these jobs is spent in gathering data and completing various reports, that 80 to 90 percent of the productive time of these persons is spent performing these duties and that their value to the Company lies in the performance of these clerical duties.

12(b). The Baggage and Mail Department jobs which require clerical skills are classified by virtue of the requirements of the jobs as Group 1 jobs. Those jobs not requiring any particular skill (generally laboring jobs) are classified as Group 3 jobs. All Baggage and Mail Department employees fall within one of these two groups or classes. The classification of jobs in this manner is based on the different skills required in the jobs and is not motivated by racial considerations and does not effect any racial discrimination.[13] Most of the Group 3 employees are Negro and most of the Group 1 employees are white. There are, however, and have been since at least 1962, white employees in Group 3 and Negro employees in Group 1.[14] Plaintiff failed to prove that any job vacancy in Group 1 (which pays better than a Group 3 job) was filled by an em-

12d. During the course of the trial the Court, accompanied by counsel for all parties, conducted a view of the premises, particularly observing the extensive facilities of the Baggage and Mail Department. The Court advised the parties of its extensive familiarity with all the premises of the Company and that knowledge also supports the Court's findings with respect to the business purposes of the departmental structure of the Company.

13. These classifications exist on a Nation-wide basis and find their genesis in General Order No. 27.

14. At the time of trial the largest group of BRAC members was in the Baggage and Mail Department where there were 26 employees in Group 1 jobs, 3 of whom were Negroes, and there were 176 employees in Group 3 jobs, 13 of whom were white.

ployee possessing less qualifications than any Negro employee in Group 3. The record shows that every person hired, advanced or transferred into a Group 1 job was the best qualified person then available for the job. Finally, the record does not show that any Group 3 employee has been denied a Group 1 job because of his race.

13. The Agreement between the Company and the BRAC provided in Rule 4, prior to amendment on November 21, 1962:

"Employees covered by these rules shall be in line for promotion. Promotion shall be based on seniority, fitness and ability; fitness and ability being sufficient, seniority shall prevail *except, however, that this provision shall not apply to excepted positions or to paragraph (4) of Rule 2.*" (emphasis supplied).

The reference to paragraph (4) of Rule 2 is to Group 3 employees. The underlined portion of that Rule was stricken by amendment of November 21, 1962, and the Government argued that, prior thereto, the Rule operated as a bar to the promotion of Group 3 employees. It is clear from a reading of the BRAC Agreement as a whole, however, that Rule 4 was not intended to bar promotion of Group 3 employees. (In fact, Rule 3 of the Agreement specifically provides that Group 3 employees who are advanced to Group 1 retain their seniority in Group 3 for force reduction purposes; such a provision is inconsistent with any theory that Rule 4 barred advancement from Group 3 to Group 1). The pre-1962 Rule simply provided that seniority in Group 3 did not establish a *contract right to bid* and be considered for Group 1 jobs.[15] Moreover, the record shows that the absence of such seniority rights is grounded in the func-

tional differences between the skills (clerical as opposed to non-clerical work) which are required in jobs falling within the two groups. The name of the labor organization itself reflects the wide range of skills and classes of labor of the employees represented. More significantly, however, the record shows that it is the established practice throughout the railroad industry not to allow bidding rights to employees seeking to transfer between crafts, classes or jobs requiring unrelated skills.[16] It is also significant that such rules apply similarly in areas where white employees hold jobs in the lower classifications.[17] In the final analysis, however, the issue was mooted by the 1962 clarifying amendment. The Government failed to prove any qualified Negro was denied advancement because of Rule 4 prior to its amendment, and it was unable to establish any racial discrimination resulting from Rule 4 prior to its amendment, and *a fortiori* there has been and could be no continuing racially discriminatory effect. The Court concludes that the BRAC Agreement was not intended to, and has not, resulted in racially discriminatory effects as to any employee at any material time.

14. The Baggage and Mail Department operates three shifts daily, seven days a week. In order to assure that the manpower needs of the Department are met at all times, an extra board is maintained from which Group 3 mail handlers are called to work in any of the mail handling jobs for which there is, at that time, a need for help. No extra board is maintained for Group 1 jobs. The more limited Group 1 requirements are met by hiring employees for irregular work and not assigning them to regular jobs. Bulletins announcing these job openings are not posted because the

---

15. See paragraph IV. 13, *infra.*

16. Defendants' expert on railroad collective bargaining agreements testified that the concept of separate classes or groups of employees within the BRAC could be traced back as far as 1918 and General Order No. 27 and was reaffirmed by the United States Railroad Labor Board which established the basic language found in agreements (including the one between the Company and BRAC) on railroads throughout the Nation. See also paragraph IV. 7 n. 44, *infra.*

17. See paragraph IV. 3 n. 42, *infra.*

Company would then be compelled to specify a job, hours and off days and to work (or at least pay) the bidding employee whether needed or not. As a practical matter, at least three Negro Group 3 employees obtained their initial Group 1 experience by filling in on Group 1 jobs on an irregular basis without regular assignment, and there is no showing that the procedure was designed, created or maintained with the intent to discriminate based on race or that it operated to deny Negro Group 3 employees promotion opportunities.

15. By a bulletin dated April 4, 1967, all employees of the Baggage and Mail Department were informed of the Company's need for clerical applicants. The notice indicated that the general qualifications included typing, simple mathematics, clerical training sufficient to compile and maintain reports, good character, dependable and efficient performance, sound judgment and mental and physical fitness sufficient eventually to qualify as a supervisor of mail handling operations. The notice stated that Baggage and Mail Department employees possessing equal or higher qualifications would be given preference over non-Baggage and Mail employees and that those interested should contact specified persons for interview and written examinations. Most of the Group 3 Negro employees in the Baggage and Mail Department do not possess typing ability and do not have education or work experience backgrounds which include mathematics or clerical training. The notice fairly indicated the general requirements for Group 1 jobs, and after being encouraged by management personnel to do so, a number of Group 3 employees were interviewed and tested. The Court finds that the April 4, 1967, notice was not designed, promulgated or posted with the intent to mislead or discourage Negro employees from seeking Group 1 jobs, but was in fact designed to determine who among the Group 3 employees might possess qualifications which had escaped the observations of Company officials. Similarly, the notice was intended to encourage those possessing such qualifications to make their qualifications known, and also to permit management to find employees who should be considered for future advancement.

16(a). With respect to the Purchasing Department, Nathaniel Sears, a Negro Group 3 employee, testified that he had sought promotion to a Group 1 (Stockman's) job in 1967. The record shows there are two Stockman's jobs, one of which required typing, and that the job *not* requiring typing became vavant in 1967. That job was then filled by a Group 1 employee (J. W. Griffin) who previously held the other Stockman's job and who held seniority rights entitling him to bid on the vacant job. Thus, the Stockman's job remaining vacant was the one which required typing. Mr. Sears did not apply for it after being told that typing was a requirement, since he could not type. The Stockman's job which does not require typing became vacant again in 1969, Sears was asked if he wanted to apply, he applied for it and was awarded it.

16(b). The Court finds no racial discrimination in this sequence of events nor in the job experience of Mr. Sears. The initial opening in 1967 was in the same Stockman's job which Mr. Sears now has. However, Mr. Sears did not have seniority rights entitling him to bid on that job and the employee awarded the job did (and, moreover, he had qualifications superior to those of Mr. Sears). The failure to accord Mr. Sears, and others similarly situated, such seniority rights cannot be said to be racially discriminatory. The skills exercised in Group 3 jobs (primarily laboring jobs) do not provide the training necessary for the functionally different Group 1 jobs (primarily clerical). Moreover, these seniority rights are essentially similar to those promulgated by the United States Director General of Railroads in 1918 and to those prevailing on other railroads throughout the United States. They were not designed or created, and have not been maintained, with the in-

tent to discriminate based on race and such is not their effect.

17(a). Rule 2 of the Agreement between the Company and the BMWE provides:

"(a) New positions for foremen and vacancies for foremen, and all other promotable employees, will be bulletined within forty-eight hours prior to or following date such vacancy occurs. Temporary vacancies of ten (10) days or more, or vacancies existing for ten (10) days, will be bulletined.

"(b) Appointments to new positions or to fill vacancies will be made after bulletin notice has been posted for a period of forty-eight (48) hours at headquarters of employees entitled to consideration * * * "

17(b). Two Negro Roadway Laborers testified that such bulletins were not posted where they could see them until March, 1969.[18] Plaintiff asserts that, as bulletins were not posted where Laborers could see them, Laborers are not "employees entitled to consideration." As all Laborers at the time of trial were Negro, it is asserted that the Rule is racially discriminatory.

17(c). The Court will not engage in making an inference upon an inference; there is nothing to show that Negro Laborers were denied promotion opportunities because they were Negro. The record shows that whites and Negroes have worked at the Company as Laborers and have been subjected to the same Rule. The record also shows that Negro Laborers have been promoted.

17(d). The record shows that General Order No. 27, promulgated by the Director General of Railroads in 1918, provided that the seniority rights of Laborers, as such, will be restricted to their gangs. Similar provisions exist today in contracts on other railroads throughout the country.[19] The fact that Section Laborers have no contract rights to bid for other jobs in the Roadway sub-department reflects no racial discrimination; it is consistent with nationwide railroad practice. Moreover, the absence of such "contract rights" has not been and is not a bar to advancement as Laborers (including Negroes) have advanced to higher positions within the Department.

17(e). The Court finds nothing racially discriminatory about Rule 2, its application or continuation. The Court finds that the word "promotable" as used therein has not during any material time been interpreted or applied to limit the promotion or other employment opportunities of any person because of his race.

18. Until January 1, 1969, the seniority rosters for the Roadway sub-department of the Maintenance of Way and Structures Department were maintained with the skilled employees listed at the top of the page and the Laborers listed at the bottom. There is no proof that the listings on the rosters prior to 1969 were motivated by considerations of race or affected in any way the employment opportunities of any Negro employee. The record shows that Laborers whether white or Negro would have been listed at the bottom of the roster page, and that employees holding other job classifications whether white or Negroes would have been listed at the top of the page. Three Negroes whose names were included in those rosters testified, none complained about them, and, in fact, two of the three have been promoted out of the Laborer's classification.

18. One of the two noted, however, that he always knew of vacancies.

19. Testimony by defendants' expert based upon a comparative study of collective bargaining agreements on other railroads throughout the Nation established that separate Section Laborer classes exist on the Belt Railway Co. of Chicago, on the Illinois Central Railroad Co., and on the Chicago, Burlington & Quincy Railroad Co., to name but a few. This testimony was further reinforced by the uncontroverted testimony of Mr. Roy Painter, Vice President, BMWE, who, though white, worked for nine years on the Norfolk & Western Railway Co. as a Section Laborer in a separate seniority class.

The Court finds that no roster listings reflected racially discriminatory intent or adversely affected the employment opportunities of any Negro employee.

19. Three Negroes (George Gaskins, Albert Collier and William Lockhart) who work in the Roadway sub-department testified for the Government. None complained [20] about his initial hire as a Laborer or about the job in which he was initially employed. Rather, each testified about his desire for promotion. Mr. Gaskins had unsuccessfully sought a Machine Operator's job in 1962. The record established that the person hired for the job (W. E. Davis) was an experienced Machine Operator, having been with the Atlantic Coast Line, and that Mr. Gaskins had no such experience. Mr. Gaskins also apparently wrote out a "bid" for a Carpenter Helper's job on July 23, 1969, but he did not submit it because he did not want to lose his seniority in the Roadway sub-department (the applicable union agreement provides that upon transfer from Roadway to any job, such as that of Carpenter Helper, in the Bridge and Building sub-department, Roadway seniority would not be transferred). Mr. Gaskins did obtain a Welder Helper's job later in 1969 which pays more than the Carpenter Helper's job and which is in the Roadway sub-department. Although Mr. Gaskins did not apply for the Carpenter Helper's job in 1969, the Court finds that the qualifications of the person hired for the job (J. F. Seaward), who had prior experience as a Carpenter, were superior to those of Mr. Gaskins.

20(a). No significance relative to the issue of racial discrimination can properly be attributed to Gaskins' failure to seek the Carpenter Helper's job in 1969 because of the loss of seniority in the Roadway sub-department which would have resulted. The functional differences between the jobs in the Roadway and in the Bridge and Building sub-departments make seniority in one meaningless as an indicator of ability or experience for the other. In any event, the contract provisions relating to the transfer, retention and accumulation of seniority apply equally to Negroes and whites, they are substantially the same as those contained in General Order No. 27 promulgated in 1918 by the Director General of Railroads and to those in effect today on other railroads throughout the United States, and they do not operate to deny, and they are not intended to deny, Negroes promotional opportunities because of race.[21]

20(b). Mr. Collier worked occasionally and temporarily as a Welder Helper during the 1965–1968 period, and he was promoted to Welder Helper in 1969. His complaint was that he had not received a similar job which had become vacant in 1967. The record shows that the person then hired for the job (G. B. Roberts) was a qualified Welder (although he was hired for the Welder Helper's job) and that he possessed qualifications superior to those of Mr. Collier. Mr. Robert's employment as Welder Helper gave the Company a qualified standby Welder, which was a proper operational and non-racially discriminating goal of the Company. Mr. Lockhart also testified concerning the job which Mr. G. B. Roberts obtained, but Lockhart did not even make inquiry about the job until sometime in 1968 at which time there was no vacancy. In any event, Mr. Roberts also possessed qualifications for the job superior to those of Mr. Lockhart.

20(c). In the testimony of these three witnesses, the Court finds no evidence of racial discrimination. The Court finds that in each case the Company employed for the job vacancy the best qualified person then available.

---

20. Lockhart responded affirmatively to a question whether he was "assigned" to the job of Laborer, but he had worked for two years as a Track Laborer with the Seaboard and was cut off there. He then came to the Company and his employment application shows he applied for a job as a Track Laborer.

21. See IV., *infra.*

The testimony provides additional support for the Court's finding that at all material times the persons hired or promoted by the Company have been the best qualified then available, and, conversely, that no Negro has been denied a job or a promotion because of race.

21(a). There are currently in force between the Company and certain of the shopcraft unions "upgrading agreements" affecting employees in the Mechanical Department. In 1942 when the Company faced during World War II a critical shortage of Electricians, the Company and the IBEW [22] executed an upgrading agreement permitting Electrical Helpers who work as Electricians for a specified period of time to be promoted to Journeymen Electricians.[23] Similarly, when faced in the Spring of 1969 with a severe shortage of Machinists,[24] the Company was forced to set-up three Helpers to do very limited types of Mechanic's work.[25] Thereafter, an upgrading agreement affecting both the Machinists and Carmen [26] crafts was executed on December 1, 1969.

21(b). These two agreements—the 1942 Electricians agreement and the 1969 Machinist and Carmens agreement —are different with respect to the question of retention of Helper seniority.[27]

22. A representative of System Federation No. 50 (the joint bargaining representative for the federated shopcrafts) was also a signatory to the July 1, 1942 Memorandum of Understanding.

23. In the absence of such an agreement, the record shows that the only way to become a Journeyman Mechanic (a Carman, Electrician, Machinist, etc.) on any railroad in the Nation is to serve a regular apprenticeship for a specified period of approximately four years; and Helpers are ordinarily never "promoted" to Journeyman because their service as Helpers in no way qualifies them for Mechanic's work. On the other hand, a Helper who under the provisions of an upgrading agreement, *performs Journeyman's work* (and receives Journeyman's pay) for a specified period is recognized as having gained enough experience to perform some (but usually not all) types of the Mechanic's work. All of defendants' witnesses testified, however, that an upgraded Helper who became a Journeyman through practical experience performing some (but not all) types of Mechanic's work is never as well qualified to do Mechanic's work as is the apprentice who has been formally trained in all aspects of the particular trade.

24. The shortage was precipitated when Seaboard Coast Line Railroad Co. recalled several of its former Machinists who, when furloughed by that railroad, had secured employment at the Company. As furloughed employees, these Machinists had established seniority dates which were earlier dates than they established at the Company and which they would have forfeited unless they returned to Seaboard service when recalled to protect their established seniority rights. The record shows that, in this period of declining manpower in the railroad industry, many employees consider maintenance of their earliest seniority dates to be their greatest hedge against lay-off in a reduction in force.

25. A "set-up" Helper is one who is "promoted" even though recognized to be basically unqualified to do Mechanic's work by Company, union and himself alike. He is simply assigned what little work he is qualified to do as a stop-gap measure to get the Company through an emergency. Since such work is Mechanic's work which a Helper is not ordinarily permitted to perform, the parties must necessarily make an exception to the general rule (*see* Rule 24 of Agreement between the Company and System Federation No. 50) which provides that none but Mechanics may do Mechanic's work; hence, a Memorandum of Understanding is usually executed. [The record shows that the Company's assignment of Machinist work to the three set-up Helpers prior to execution of any such memorandum resulted in a grievance being filed by the Machinists who felt that they were entitled to do the work as overtime before the Company could advance Helpers. This grievance was settled by execution of the December 1, 1969, upgrading agreement].

26. The Company is also experiencing a shortage of Carmen, though it has not yet faced such an emergency as occurred in the Machinist craft. No Carmen Helpers had been set up as of the time of trial.

27. The 1942 Agreement provides that Helpers will retain and accumulate seniority as Helpers while employed as Mechanics. The 1969 Agreement provides (1) that

The Government contends that this difference is somehow motivated by an intent to discriminate racially. It bases this contention upon the facts that it could find no Negro who now serves or has ever served as an Electrician Helper [28] and that, on the other hand, the jobs of Machinist Helper and Carmen Helper have been held in recent years predominantly by Negroes. That contention is unsupported by any probative evidence.

21(c). This Court finds no intent to discriminate on the basis of race, nor any effective discrimination based on race, by virtue of the fact that these upgrading agreements (which were negotiated 27 years apart to meet the emergency manpower needs of their respective times) contain different provisions. The background of the 1942 Agreement is unknown except for the existence of generally recognized wartime manpower shortages. The record does show that an Electrician Helper performs more of the actual work of his craft (by necessity) than do Helpers in the Carman and Machinist crafts. This factor and the 27 year time gap explain any differences which exist between the two agreements, and the Court finds that the 1942 Agreement was not intended to, and did not, create, aid or perpetuate racial discrimination in employment opportunities. As to the 1969 Agreement, the Court finds that it arose out of the shortage of skilled Carmen and Machinists, that it is a routine agreement modeled after similar agreements of other railroads which have faced the same situation, that the provisions differing from those contained in the 1942 Agreement (involving a functionally different craft) were not intended to deprive Negroes of employment opportunities because of their race and that they do not have that effect. Finally, the Court finds the 1969 Agreement benefits the Company's Negro Helpers who, the record shows, do not possess the skills or qualifications required for qualified Carmen and Machinists and who, otherwise, would not have the opportunity to upgrade themselves except via apprenticeship programs (which the Company is not in a financial position to afford, especially in view of the contracting state of its business).

22. Helpers in the mechanical crafts (including the Electrician, Carman and Machinist crafts) do not perform the work of Journeymen. Accordingly, Helpers do not learn the skills of the Journeymen and are not expected to do so in their work as Helpers because promotion of Helpers to Journeymen is not provided for by custom, practice and agreement (throughout the railroad industry). The Company's agreement with System Federation No. 50 (which covers the "shopcrafts") contains "classification of work" rules specifying the type and nature of work which Journeymen and Helpers may and can do. Such work is mutually exclusive, and, by contract, the Helper cannot perform Journeyman's work (in the absence of an upgrading agreement). The practical result is that Helpers do not, and cannot, expect to be promoted to Journeymen solely by reason of having been Helpers. Helpers can become Journeymen, but

upgraded Helpers will retain and accumulate their Helper seniority while working as upgraded Helpers before they complete the specified qualifying period; (2) that, upon completion of the qualification period, the Helpers may elect to establish Journeyman seniority; and (3) that the question of whether a Helper who completes the period and elects to establish Journeyman seniority will be permitted to retain and continue to accumulate Helper seniority will be a subject for future negotiations in accordance with the provisions of the Railway Labor Act. Since the present Helpers were upgraded in the Spring of 1969, the earliest possible date that the seniority retention question might arise will be the Spring of 1973 (when the upgrading period will be completed and they will be eligible to establish Journeyman seniority).

28. The record shows that no Negro has ever sought employment with the Company as an Electrician Apprentice or Electrician Helper or Electrician.

only in the same way other Journeymen have achieved that status, namely, by completion of an apprenticeship or an upgrading program (both of which involve expense and the absence of any of such programs at the Company cannot be attributed to any racial discrimination). The record shows that Helpers at the Company are not qualified to become Journeymen and that those who have been upgraded can perform but a small part of the Journeyman's work. The record does not show that the "classification of work" rules are racially discriminatory in purpose or effect. The rules have applied without regard to race throughout the nation for more than 50 years. They find their genesis in General Order No. 27, promulgated by the Director General of Railroads in 1918 (see also Decision No. 222, United States Railroad Labor Board, August 11, 1921). At the Company, the only Helpers presently employed in the shopcrafts are Carman Helpers and Machinist Helpers and all of them are members of the Negro race. The Court finds that the "classification of work rules" were not created or designed, and have not been maintained or continued, with the intent to deprive Negro employees of employment opportunities. The record shows that on other railroads where the Helper job classifications are filled by white employees the same rules prevail. They are work protection rules and apply equally to Negroes and to whites.

■■ 23(a). The Court finds that Rules 24 and 25 of the Agreement between the Company and System Federation No. 50 (the shopcrafts), which restrict the use of welding equipment to Mechanics [29] and their Apprentices,[30] are founded upon two legitimate and racially non-discriminatory purposes: the safety [31] of the employee, his fellow employees, and the traveling public and the protection of the work and skills of the Mechanic and the welders' wage differential.[32] The allegations of the Government's complaint, paragraph 7(d), and its argument that these rules, together with the classification of work rules for Machinist Helpers (Rule 51) and Carmen Helpers (Rule 90), were intended to deny Negroes training opportunities essential for advancement

29. The term "Mechanic" is used to refer to the various shopcraft journeymen collectively. As Rule 25 specifically reflects, the agreement contains "special rules" with respect to each craft (Machinists, Sheet Metal Workers, Electricians, and Carmen at the Company). These special rules restrict journeymen of one craft from doing welding work generally recognized as work of another craft. *See* Rules 49 (Machinists), 74 (Sheet Metal Workers), 81 (Electricians) and 88 (Carmen).

30. The Court notes that the use of welding equipment by Apprentices is restricted to the last (or fourth) year of their apprenticeship and that the record establishes welding is a highly skilled and hazardous (to employees, passengers and public) occupation.

31. The uncontroverted testimony of Mr. Loomis showed that the railroads, under the Federal Employers' Liability Act (FELA) are obligated to provide their employees with a safe place to work and have imposed upon them by FELA unlimited liability should any negligence be

shown on the part of the carrier. A carrier, moreover, owes the highest degree of care to its passengers. Furthermore, the railroads are absolute insurers of the freight which they transport. Such liability exposure makes it imperative that the Company—with or without contract provision—insure that only qualified employees handle welding equipment and, as well, fill other jobs in the Transportation, Mechanical and Maintenance of Way Departments. Likewise, the testimony of Mr. Roy Painter, Vice President, BMWE, emphasized the need for skilled craftsmen to perform the specialized welding tasks in the Maintenance of Way Department (such as welding "frogs" or switches) where the safety of the operating employees and of the traveling public is directly concerned.

32. Rules 52 (Machinists), 70 (Sheet Metal Workers), 86 (Electricians) and 97 (Carmen), in accordance with specified work time requirements set out in Rule 25, provide for Mechanics performing welding work to receive a five cent an hour pay differential.

are unsupported by, and are contrary to, the evidence.

23(b). The Court further finds that welding restrictions such as exist in Rule 25, and the rules related to it (including the welder's pay differential) were derived from General Order No. 27 and Decision No. 222 of the United States Railroad Labor Board and that provisions virtually identical thereto can be found in shopcraft agreements of other railroads throughout the country.[33] For the reasons set out in this and the preceding paragraph, the Court finds that the welding rules were not intended to, and do not, create or perpetuate racial discrimination.

23(c). The Court finds that the Government failed to prove that the former provision [34] of Rule 33 of the Agreement between the Company and System Federation No. 50 (shopcrafts) was ever invoked to grant a "preference" to the son of any *employee* [35] over any other applicant, Negro or white, during the life of that provision.[36] The Court further finds that, according to the record, no Negro has ever been subjected to any racial discrimination because of the Rule.

23(d). Further, the preference provision of Rule 33 had its genesis in the 1921 Decision No. 222 of the United States Labor Board and comparable provisions have existed and still do exist in shopcraft contracts covering employees on other railroads throughout the Nation, showing that the former Rule covering sons of employees at the Company was never intended to be a racially discriminatory device.

24. Eight Negro employees in the Mechanical Department were called as Government witnesses. None testified that he *should* have been hired initially in any job other than the one he ob-

---

33. *E. g.*, Rule 33 of the Agreement between the Illinois Central and its shopcraft employees contains the same language, except for one additional phrase and two concluding paragraphs, as Rule 25 in the System Federation No. 50 contract.

34. The paragraph in Rule 33 providing that a "[p]reference will be given to sons of employees in the selection of apprentices * * *" was repealed by Memorandum Agreement between the parties executed September 20, 1968. A comparable provision in the contract between the Kansas City Terminal Co. and its shopcraft employees was repealed by similar agreement on April 15, 1968. The Court attaches no particular significance to the fact that the parties chose to eliminate the provision in Rule 33 and declines to draw any adverse inference therefrom in light of the fact that similar provisions were repealed on other railroads, such as the Kansas City Terminal, which were not involved in civil rights litigation.

35. The Government, in paragraph 7(h) of its complaint, alleged that the Company's preference for *"sons of craftsmen"* (emphasis added) was designed to perpetuate the "racially segregated nature of apprenticeship jobs." [The complaint in paragraph 7(g) had previously alleged that the Company assigns only whites to its

apprenticeship program—an allegation the Government failed to prove because it never attempted to show any Negro had either applied for or been refused an apprenticeship position]. It is apparent from the plain language of the former provision of the Rule that it was never restricted to sons of *craftsmen*. Rather any *employee's* son (including the sons of the Company's Negro employees who have composed nearly 50 percent of the total work force) would have been eligible under the Rule for a preference over an applicant who had no parent employed by the Company.

36. The preference provision of Rule 33 existed for almost thirty years. The Government listed a handful of former apprentices who were hired in 1958 or before and who were sons of Company employees. However, no evidence was introduced that any of these former apprentices were actually "preferred" as beneficiaries of Rule 33 over any other applicant, white or Negro. The Government has proved nothing material to any issue by reciting the preference provision of the Rule and pointing to several former apprentices who were sons of employees. Moreover, having not attempted to prove that the preference provision was applied during its existence, the Government cannot show that the now repealed provision has any present effect.

tained,[37] and the record contains no evidence that any was qualified for any other job. Their testimony centered around desire for promotion. Two of the eight (Kirby and Coleman) testified generally about the differences in the work of a Machinist Helper and Machinist; both are now working as upgraded Helpers. Another (Malone), who started with the Company in 1942 as a laborer and is now a Fuel Oil Pumper-Water Treater, said he applied for a Clerk's job in October, 1969. That job was filled by a person (Eva Baumgartner) having clerical experience who transferred by the exercise of her Group 1 seniority from another Clerk's job in the Company's Accounting Department. Mr. Malone stated he did not believe the Company was trying to hold him down. One Carman Helper (Alexander) said he wanted to be a Carman, and although he could not do all the work, he believed he could learn. Mr. Alexander stated that race was not a factor, and that "the foremans don't care; they just want to get the work out." Mr. John Pickens, a Car Cleaner, testified that he bid on a Fireman's job in 1969. Mr. Pickens had worked as a Fireman on a temporary emergency basis during World War II. The person who filled the 1969 job vacancy, however, was a fully qualified Engineer (Sam Kirby) who bid in the Fireman's job through the exercise of seniority (which was not sufficient to permit him to work as an Engineer). The qualifications of Mr. Kirby were superior to any possessed by Mr. Pickens and his selection does not reflect any racial discrimination. Pickens and

Young worked temporarily in Fireman's and Switchman's jobs, respectively, to meet temporary and emergency needs peculiar to the wartime situation during World War II.[38] At the conclusion of the war (and with the return of servicemen to their old jobs at the Company), they along with others working temporarily on the same basis (and including whites) were cut-off the temporary, emergency job duty without having obtained seniority therein. Each, however, had maintained and continued to accumulate seniority in his regular job. The Court finds that there is no competent, persuasive evidence of racial discrimination in any of the events recited in this paragraph or with respect to any of the witnesses named herein.

25(a). The Transportation Department includes, among others, jobs in engine service (Engineer, Hostler, Hostler Helper, Fireman) and train service (Conductor and Switchman). Article 22 (a) of the "Rates of Pay and Regulations Covering Engineers, Firemen, Hostlers and Hostlers Helpers" states:

"Seniority rosters will be published and posted on January first, and July first of each year, such rosters to show: (1) Seniority dates of Engineers, (2) Seniority dates of Hostlers, and (3) Seniority dates of Firemen and Hostler Helpers separately[39] as to promotable and non-promotable men."

Article 14(b) of the agreement between the Company and its Yardmen states:

"When forces are reduced, yardmen will be removed in the order of their

37. Three (Malone, Tillman and Young) responded affirmatively to a question whether he had been "assigned" to his initial job, but the employment application of each shows that he applied for the job he received.

38. The record shows that a number of the Company's employees (including Negroes and whites) worked temporarily during the emergency situation created by World War II in Fireman's and Switchman's jobs. It also shows that none acquired seniority for that work. The Court finds

that Negroes and whites were treated alike and that no racial discrimination has been shown to exist.

39. It has been asserted that Negroes were treated as non-promotable because of their race and that the names of Negro Fireman-Hostler Helpers were listed on separate rosters. The record shows that there has been only one roster for Firemen-Hostler Helpers since the July 1, 1963, roster. There has been no racially discriminatory effect involved at any time material hereto.

seniority. When they are removed they may retain their seniority for a period of six months. At the expiration of that time the Company has the right to re-employ these men, or other men as it sees fit for the best interest of the service, and only promotable men will be employed."

A special agreement dated July 12, 1940, between the Company and the BRT stated:

"* * * on and after that date [April 23, 1940] promotable Switchman employed will carry the same seniority date as a Foreman, Backup Foreman and Helper, but with the understanding that they are not to be used in the promotable positions until they are qualified by the Management to such promotion."

As to each of those agreements, the Court finds that during all material times, the word "promotable" has been interpreted to mean "qualified," and that the aforesaid provisions have not been used (and are not used) in any way with the intent to deprive (and do not deprive) Negroes of employment opportunities.

25(b). One retired Negro engine service employee (George Gainey) was called as a Government witness. He can neither read nor write and he retired in 1966 as a Fireman-Hostler Helper. While the question should be moot as to him, the Court finds that he was not denied any job or promotion because of race.

25(c). Four present and three retired train service employees, including three Negroes, were called as Government witnesses. None of the Negro witnesses claimed any racially discriminatory job assignment. The record shows, moreover, that one train service employee hired since 1963 was a Negro (John W. Butts, Jr., who later worked in engine service) and one Switchman who was promoted to a Conductor since 1963 was a Negro (Jesse Nesmith). Not one of these witnesses uttered a complaint with respect to the Company's employment practices subsequent to World War II. There is no competent evidence that any Negro who is or has been qualified to perform the job of Conductor was denied the opportunity to work as a Conductor because of his race.

## IV. SENIORITY SYSTEM [40]

1. The Court finds that the provisions of the collective bargaining agreements currently in force between the Company and the respective unions representing employees in the particular crafts and classes at the Company had their genesis in work rules and contract provisions in existence prior to World War I which were adopted and promulgated as the uniform national railroad wage and work rules established in General Order No. 27 and the various supplements, addenda and amendments thereto, promulgated May 25, 1918, by the Director General of Railroads, United States Railroad Administration, pursuant to authority vested in him by the Federal Control Act of 1918, 40 Stat. 451.

2. The Court further finds that, after the period of Federal control, the

40. By virtue of the Court's finding that the Government has failed to prove any racial discrimination in employment by the Company and in light of the Court's finding that the collective bargaining agreements provide bona fide seniority systems, the Court is not required to and does not rule on the issue of whether a contract may be changed other than in accordance with the procedures established in the Railway Labor Act, 45 U.S.C. § 151 et seq. The Court also finds that the collective bargaining agree-

ments now in effect between the Company and the unions were negotiated by representatives of the Company (or, where the Company is a party to a nationally negotiated agreement, by the NRLC, the industry negotiator) and international, system or federation representatives of the unions. Agreements relating to wages, work rules, conditions of employment or fringe benefits are not negotiated with local lodges of any of the labor organizations. All agreements apply equally to all covered employees regardless of race.

uniform national contract provisions were reaffirmed (and interpreted) in a series of decisions of the United States Railroad Labor Board, established under the Transportation Act of 1920, 41 Stat. 456, such as Decision No. 630 (Docket 475) (Jan. 23, 1922) (Defendants' Exhibit B), which established the format and language of future agreements between BRAC and virtually every railroad in the Nation (including the Company), and such as Decision No. 222 (Docket 475) (Aug. 11, 1921), which similarly established the format and language of future agreements between RED (shopcrafts) and virtually every railroad in the Nation (including the Company).

3. In addition, the Court finds that, by virtue of their common genesis in General Order No. 27 and the various decisions of the United States Railroad Labor Board, the provisions of the respective collective bargaining agreements now in force between the Company and the respective unions are either identical to or substantially in conformity with similar provisions contained in contracts between other railroads throughout the Nation and unions representing employees on such other railroads.[41]

4. The Court, furthermore, finds that the application and effect of the comparable subject matter provisions of agreements at the Company and on railroads throughout the country are the same regardless of the race of the employees affected by such provisions.[42]

41. The Court predicates this general finding upon the uncontroverted testimony of the various expert witnesses called by defendants who testified from their own experience with contracts covering employees in all crafts and classes of service on numerous railroads throughout the Nation. Particularly convincing was the analysis of the defendants' expert, Mr. J. E. Wolfe, the former Chairman of the National Railway Labor Conference (NRLC) who compared in detail various provisions of the contracts currently in force at the Company with contracts covering the same crafts and classes on five specific railroads—the Chesapeake & Ohio-Baltimore & Ohio R. R. Co., the Chicago, Burlington & Quincy R. R. Co., the Illinois Central R. R. Co., the Belt Ry. of Chicago, and the Kansas City Terminal Co.—and showed how the modern work rules on railroads throughout the nation can be traced to a common, uniform source, General Order No. 27.

Mr. Wolfe had 50 years of experience in the railroad industry, with concentration for 30 years on railroad-union relationships. During the latter part of his career he was responsible for carrier negotiations with unions first on a regional, and later on a national, basis. His preeminent stature is reflected in the fact that he was requested by Presidents Eisenhower, Kennedy and Johnson to undertake numerous assignments in the field of railroad labor relations.

Mr. R. E. Loomis, Assistant Vice President, Labor Relations, Southern Railway Company, who testified in behalf of the Company with respect to labor relations and fair employment policies of one of the owners of the Company, reinforced the testimony of Mr. Wolfe. Mr. Loomis, who is both an engineer and a lawyer, had 19 years of experience in the railroad industry, including approximately ten years in railroad operations in an engineering capacity and the remainder as assistant to or chief executive officer for labor relations.

Consistent with the testimony of Messrs. Wolfe and Loomis was the uncontroverted testimony of six officers of international labor organizations.

42. In this regard, the testimony of the defendants' expert, who, when chairman of the NRLC, was a member of the railroad industry's national Equal Opportunity Committee which was established at the time of the passage of the Civil Rights Act to scrutinize railroad employment practices and advise with respect thereto, is convincing. On the basis of a study he made of the 1969 annual reports filed with the Equal Employment Opportunity Commission (EEO-1 forms) by seven railroads selected for their national geographic and territorial coverage and similar characteristics of operations—the same five railroads mentioned in footnote 41, supra, plus the Bangor & Aroostook R. R. Co. and the Great Northern Ry. Co.—he concluded that the application and effect of contract provisions alleged to be racially discriminatory against Negro laborers and service workers (the categories of positions to which the Government continually referred as

5. The Court specifically finds that, as the parties agreed in the pre-trial stipulation introduced into evidence as Joint Exhibit No. 1, "[w]hite and Negro employees similarly situated are subject to the same provisions regarding transfer, accumulation and retention of seniority."

6. The Company's adoption of rules having their genesis in the 1918 order of the Director General and of the craft/class seniority system both in effect Nationwide, negates any suggestion that such rules and system were adopted with any intention to discriminate with respect to race. Moreover, the fact of that adoption establishes fully the Company's affirmative defense of a bona fide seniority system.

7. Although each collective bargaining agreement uses language peculiar to the particular craft involved, each contract defines the qualifications and work of the craft and of the various classes within the craft.[43] These classification of work and qualification rules became standardized Nationwide with General Order No. 27 and were reaffirmed in the decisions of the United States Railroad Labor Board. Such rules may be found today in the respective agreements governing employees in the same crafts and classes on railroads throughout the Nation.[44]

The record shows that the effectiveness of the craft and class system, upon which the seniority system is predicated, is dependent upon the stability and in-

"Negro jobs": "laborers," as the term is used in the EEO–1 report encompasses in the railroad industry shopcraft helpers, ice and watermen-car cleaners, fuel oil pumpers, roadway section laborers and welder helpers, bridge and building laborers, and stores department laborers; the term "service worker" includes mail and baggage handlers, redcaps and store helpers) who were employed by the Company were the same as those in effect on the other seven railroads even though substantial numbers of incumbents in the two general job categories on those other roads were *non-Negro* as late as 1969:

| RAILROAD | SERVICE WORKERS— % Non-Negro | LABORERS— % Non-Negro |
|----------|------------------------------|------------------------|
| C, B & Q | 49.3% | 83.3% |
| Great Northern | 71.1% | 98.5% |
| Bangor & Aroostook | 100.0% | 100.0% |
| K. C. Terminal | 52.7% | 44.9% |
| Illinois Central | 33.2% | 36.7% |
| Chicago Belt | 80.0% | 88.9% |
| C & O–B & O | 23.5% | 28.5% |

43. *See, e. g.*, Shopcraft Agreement Rules 24 (Mechanics collectively), 48–51 (Machinists), 73–76 (Sheet Metal Workers), 80–83 (Electricians), 87–90 (Carmen); Signalmens' Agreement Scope and Classification (Rules 1–5); Yardmasters Agreement, Rules 1–2; and Clerks Agreement, Rules 1–2.

44. In his study comparing the Company contract provisions with General Order No. 27, United States Railroad Labor Board decisions, and current contract provisions on other railroads throughout the Nation, Mr. Wolfe showed, for example, that with rare exceptions the shopcraft classification of work rules for the respective Craftsmen, their Apprentices and their Helpers in the current contract at the Company were virtually identical with comparable rules on the Chicago Belt, the Illinois Central and Kansas City Terminal and that the rules are, in turn, almost the same as comparable rules in General Order No. 27 and Decision No. 222 of the United States Railroad Labor Board. Similarly, the rules in the Agreement between the Company and the Clerks which define the respective work of clerks and non-clerks or laborers (Scope and Qualification Rules) and comparable rules on the Illinois Central, the C, B & Q and the Chicago Belt are directly traceable to General Order No. 27 and Decision No. 630 of the United States Railroad Labor Board.

tegrity of the classification of work and qualification rules. The record further establishes that these rules insure the safe, economic and efficient operation of the Company by providing that the most qualified employees will be available to management.[45] The Court finds that the foregoing rules and the system upon which they are based are part of a bona fide seniority system.

8. Seniority, under the agreements between the Company and the respective unions, usually begins at the time the employee's pay starts in the craft and class (or other subdivision thereof) to which he is regularly assigned.

9. At the Company and Nationwide, seniority is normally confined to the class and craft (or other subdivision thereof) within which an employee is employed.

10. Seniority may not be transferred from one craft to another craft, under the terms of any agreement in force at the Company or in the railroad industry. Moreover, seniority ordinarily [46] may not be transferred from one class to another class even within the same craft.

11. A few contracts in force at the Company and on other railroads provide for continued accumulation of seniority in crafts and classes (or other subdivisions therein) from which an employee has advanced, such accumulation rights providing security against a reduction in force in the job classification to which the employee (who in the new position is a "junior" employee) has advanced. The record establishes that loss of seniority upon transfer from one craft or class to another is designed to promote employment stability, to discourage job hopping, to assure a supply of qualified labor and to protect employees in particular jobs from lay-off by reason of the exercise of roll back rights by employees in different crafts or higher classes. Conversely, in some crafts including employees who are dual qualified and who work irregular assignments,[47] accumulation and retention of seniority insure maximum job security for the senior (and presumably the more qualified) employees. In all cases, however, the exercise of seniority in reverse is narrowly restricted to involuntary lay-off circumstances so as to protect employees in lower classes from being laid off by an employee in a higher class who might simply want to secure preferred hours, off days or other seniority privileges.[48] The Court finds that the grant or ab-

45. Mr. James Yost, President of the RED testified that the craft and class seniority system not only contributes to the safe, efficient and economical operation of the particular railroads, but it also contributes during periods of national emergency, such as World War II, to national defense by providing a self-sufficient transportation system (as opposed to one dependent upon independent non-railroad contractors for preventive or corrective maintenance) capable of responding effectively to national defense requirements.

46. Rule 6 of the Agreement between the Company and BRAC is an exception. It provides for the transfer of one-half up to five years of accumulated seniority when moving to another department or seniority district *within the same class* (Group 1 or Group 3). Mr. Smith, the Company Manager for Personnel and Claims, testified that Group 3 employees moving among several non-clerical employee districts also benefit from Rule 6. The Court finds that under the terms of the provision the benefits of this rule are available to both Group 1 (clerical) and Group 3 (non-clerical) employees within their respective classes. The provision does not give credit to an incumbent of Group 1, for example, for time spent in Group 3, where no related experience could be gained. The Court, moreover, finds that Rule 6 was never intended to discriminate racially and it does not have such an effect. Rather, it would appear to benefit both Negroes and whites.

47. *E. g.*, engine service (Engineers—Hostlers flow back rights) and train service (Conductors—Switchmen flow back).

48. Numerous witnesses testified that employees who have labored many years (often with less desirable hours and off-days) in a lower class of work are entitled to job security in return for faithful service. Consequently, indiscriminate, voluntary exercise of seniority in a lower class is either not provided for or is severely restricted.

sence of contract rights to accumulate and exercise seniority in a job other than the one held (and generally one in a lower classification) at the Company is consistent with contract rights governing similar crafts and classes on railroads throughout the Nation, whether such rights are granted or not is dictated by the exigencies of the work of the particular craft and class involved, and that the existence of such rights or the lack thereof is predicated upon legitimate business considerations, as well as fundamental fairness to the affected employees without regard to race.

12. The various rules in contracts providing for commencement of seniority and confining such seniority to the particular craft and class (or other subdivision thereof) in which an employee is employed have their origin in General Order No. 27 and the various decisions of the United States Railroad Labor Board; and comparable rules may be found today in the contracts governing employees on other railroads throughout the Nation.

13. An employe who possesses seniority in a particular craft and class (or subdivision thereof) is entitled as a matter of *contract right:*[49]

(i) To be provided with notice (through bulletin for an appropriate period in a specifically designated location) of all vacancies or newly created posi-

tions occurring within his craft and class (or subdivision thereof);

(ii) To bid on such vacancy or new position;

(iii) To be awarded such position if he has sufficient fitness and ability and provided he is the senior eligible bidder;

(iv) To be layed-off during a reduction in force only after all those junior to him; and

(v) To select, where applicable, preferred working hours, off days, vacations and other privileges granted on the basis of length of service in the craft and class (or subdivision thereof).

The "contract rights" principles controlling whether employees at the Company are entitled to bid on and be awarded new or vacant positions are and have always been common to all collective bargaining agreements in the railroad industry.

14. The Court finds that the foregoing rules with respect to accumulation, transfer and retention of seniority, and the prerequisites of the exercise of seniority, have sound business purposes grounded upon safety, economy and efficiency of railroad operation, apply Nationwide and have their genesis in General Order No. 27, were not intended to have, and do not have, racially discriminatory effects, and are parts of a bona fide seniority system.[50]

---

49. An employee *without* seniority in a particular craft and class (or subdivision thereof) *has none of the contract rights* set out in paragraph 13(i)–(v); but, if no employee with contract rights bids on a vacancy or new position, an employee without contract seniority rights may apply for the vacancy or new position, will be considered therefor and will be awarded the position if he is the *best qualified* applicant therefor. In addition, under Rule 6 of the Agreement between the Company and the BRAC, a member of that organization who possesses no contract right to bid on a job within the scope of the agreement because he is not in the same class (Group under that con-

tract) or district is entitled to preference over any non-member of the labor organization if he has *equal or better* qualifications.

50. The Court, in making the foregoing findings in paragraphs 1–14 inclusive, relies upon the evidence adduced and the uncontroverted testimony of the Company's expert, Mr. Wolfe, who clearly delineated the differences between the situations of employees with certain specified contract *rights* and those entitled only to *consideration* for vacancies. The testimony of Mr. Robert Loomis of the Southern Railway Company was equally substantial on this subject.

## V.

## FINDINGS OF FACT IN REGARD TO UNION DEFENDANTS

### A. *General.*

1. The allegations in the Government's complaint, charging acts and practices on the part of the Company which are contended to constitute an intentional pattern and practice of resistance to the enjoyment by Negroes of the rights secured to them by the Act, include the contention (Par. 9) that the union defendants are parties to collective bargaining agreements with the Company and that:

> Each such agreement contains provisions which tend to perpetuate the effects of the discriminatory acts and practices of the company described in paragraph 7. Such provisions include those in certain contracts which require the company to give preference to sons of employees in the selection of apprentices and which prevent the company from providing training to Negro employees in skills essential to certain higher paying jobs, such as training in the use of welding equipment.

2. In its pre-trial brief filed January 5, 1970, the Government varies this contention somewhat so as to state that:

> [T]he defendant unions, through their collective bargaining agreements with the Company, have caused or attempted to cause the Company to take action which has tended to perpetuate the effects of the discriminatory acts and practices of the Company in violation of Section 703(a) (c) and (d) of the Civil Rights Act of 1964, 42 U.S.C. § 2000–e 2(a) (c) and (d).

3. These contentions are understood by the Court to allege that where the Government has proved an act or practice by the Company which is found to be violative of the Act, the provisions of the contracts which the Company has entered into with the defendant unions cause the Company to take action which will "carry forward" or "continue" the "effects" of any such unlawful employment act or practice.

4. In this regard the Government asserts in its pretrial brief that the job categories are segregated by race, that such segregation is the result of intentional racial discrimination, and that the present system of craft seniority in effect at the company is unlawful "because it continues the pattern and practice of racially discriminatory employment assignments".[51]

5. In previous findings the Court concluded that the record does not permit it to find that the "hiring and initial job assignment acts and practices of the Company are in violation of the Act, and that the Government has failed to prove that there are "black" or "white" jobs as such at the Company because of intentional employment acts and practices of the Company.

6. Those findings have equal applicability here as to the Company's and the union defendants' administration of the provisions of their collective bargaining agreements which, the Government is understood to contend, "perpetuate" the effects of the alleged racially discriminatory employment practices of the Company. It is elementary to state that the failure of the Government to prove a pattern of racially discriminatory employment practices justifies a finding by the Court that there are no unlawful "ef-

51. Accordingly, predicated upon its proving that the Company has historically, consistently, and currently since the effective date of the Act, discriminated in the hiring and initial assignment of its Negro employees, the Government would require that the Company disestablish its use of the uniform railway craft and class seniority system prevailing on all railway properties, since the origin of the railroad industry and constituting the foundation upon which collective bargaining representation since 1934 has been conducted under the Railway Labor Act, 45 U.S.C. § 151 et seq., and under regulations of the Interstate Commerce Commission relating to Uniform Classifications of Railway Employees.

**600**

fects" which can be said to be "prepetuated" by the provisions of the agreements between the Company and the union defendants.

7. The Court specifically finds that the failure of the Government to prove a pattern of racially discriminatory acts and practices on the part of the Company requires a finding that there are no unlawful effects to be perpetuated by the provisions of the collective bargaining agreements.

8. The Court has heretofore found that the Government failed to prove that the provision granting preference to sons of Company employees in the selection of apprentices which was in Rule 33 of the agreement between the Company and defendant System Federation No. 50, Railway Employees' Department, covering the defendant Shopcraft Unions, prior to its cancellation, effective September 20, 1968, had been administered in a manner such as to constitute an unlawful employment practice, and such finding has equal applicability to the described defendant unions.

9. In similar manner, the Court has specifically found that the Government has not proved that the requirement in the contracts of these same unions with the Company that the use of welding equipment be restricted to mechanics and apprentices constitutes an unlawful employment practice, and such finding is equally applicable to these defendant unions.

10. The Court makes the further general finding that all of the provisions of the collective bargaining agreements apply in the same manner to the positions represented under each of such agreements without regard to the race of the incumbent of any of such positions, and Government counsel agreed in the pretrial stipulation that "white and Negro employees similarly situated are subject to the same provisions regarding transfer, accumulation and retention of seniority".

11. The Court further finds that Government counsel agreed in open court that the provisions of each of the current collective bargaining agreements were not racially discriminatory by their terms and in and of themselves.

12. The Court specifically finds that none of the defendant labor unions or their representatives possess or have ever attempted to exercise any influence or control with respect to the hiring of employees, or as to their promotion except where a promotion may be found to contravene a seniority provision of the applicable agreement. Such rights are exclusively those of management of the Company, except in an instance where an employee may challenge the failure of management to promote him in accordance with his seniority, fitness and ability. The evidence of record fails to disclose that any dispute of this nature has occurred between the Company and any of its employees.

13. The Court finds that the defendant unions do not maintain hiring halls and job-referral systems, or exercise any authority in the selection of applicants for employment. After the employees acquire seniority in their respective crafts and classes of employment upon commencing work, they are represented by the union defendant representing their craft or class. Certain of the agreements require (as authorized by the Railway Labor Act) that an employee become a member of his union (usually after a qualifying period of 60 days employment) or pay amounts similar to dues as a condition of continued employment with the Company.

14. The Court specifically finds that the certified bargaining representatives of the various crafts and classes of employees of the Company are the national and international unions named as defendants in this action and not the local lodges of which employees are members. Negotiation of revisions in agreements between these defendants and the Company, pursuant to provisions of the Railway Labor Act, is undertaken by national representatives of the defendant unions, or officials of subordinate bodies of

the national unions, such as System Boards of Adjustments, System Federations, and their counterparts.

15. The Court finds that the Government has not proved that the defendant unions through their collective bargaining agreements have caused or attempted to cause the Company to take action which has, or which has tended to, perpetuate the effects of alleged but unproven discriminatory acts and practices of the Company in violation of any section to Title VII of the Act.

16. The Court finds that the Government has not proved that the provisions of any of the collective bargaining agreements prevent the Company from providing training to Negro employees in skills essential to certain higher paying jobs.

17. During the case in chief of the defendants, testimony was presented by six (6) international officers [52] and two (2) local officers [53] of the defendant unions representing the crafts and classes of employees as to which the Government introduced evidence seeking to support its allegations relating to discriminatory employment acts and practices by the Company. Those are the employees to which the Government directed its contentions that the collective bargaining agreements cause, or perpetuate the effects of, acts and practices proscribed by the Act.

Based upon the testimony of witnesses appearing for the described defendant unions,[54] which testimony supplemented and fortified the testimony of defendants' expert witness James E. Wolfe, the Court specifically finds that the evidence is uncontroverted as concerns the provisions of the collective bargaining agreements establishing seniority systems and other working conditions for these crafts and classes of employees, and makes the following ultimate findings:

(1) that the provisions of the collective bargaining agreements entered into by the union defendants and the Company do not cause the Company to engage in any act or practice or a pattern thereof of unlawful employment acts or practices proscribed by the Civil Rights Act;

(2) that included among the provisions of each of the collective bargaining agreements entered into separately by each of the union defendants with the Company are rules relating to the seniority which is acquired by an employee whose position is covered by any of such agreements;

(3) that the seniority rules in each of said collective bargaining agreements are equally and uniformly applicable to employees represented under each of said agreements without regard to the race of any of such employees;

(4) that said seniority rules in each of the agreements are shown to be substantially similar to the seniority rules set forth in other agreements which are in effect on all railroads of the country on which each of said union defendants represents a class or class of employees in the same manner as each represents a class or craft of employees at the Company;

(5) that the seniority rules in each of the agreements serves a useful business purpose necessary to the efficient oper-

---

52. Appearing on behalf of the defendant UTU (including BLF & E) was M. W. Hampton, Assistant to President, UTU; on behalf of UTU (including BRT), was L. E. Chester, Assistant to President, UTU; on behalf of BLE, W. E. Wanke, Assistant Grand Chief Engineer; on behalf of BMWE, Roy R. Painter, Vice President; on behalf of BRAC, John C. Fletcher, Vice President; and on behalf of RED (including all Shopcraft Unions), James Yost, President.

53. A. L. Groves, General Chairman, BRAC, and G. G. Bramlett, General Chairman, BMWE.

54. These international officers testified in detail as to the basic similarity of the agreements between each of their unions and the Company to all other agreements on all railroads of the United States and Canada, and the uniform manner in which the provisions thereof have been consistently interpreted and applied without regard to the race of any employee so represented.

ation of the Company and of value to the employees involved because:

(a) the seniority rules provide for reasonable job security for each employee directly related to the duties each performs for the Company;

(b) the seniority rules provide for the maintenance by the Company of a working class of employees efficient in the performance of each of the various jobs necessary for the safe and efficient operation of its railroad operations being conducted under the authority of the laws of the United States and required by public convenience and necessity;

(c) the seniority rules otherwise serve a useful public purpose and the business interests of the Company by providing for the reasonable acquisition of additional skills by its employees under conditions historically developed and tested at least over a period of the last 50 years and found necessary for the maintenance of the various classes of skilled railroad employees;

(d) the seniority rules otherwise serve a useful public purpose and the business interests of the Company by the maintenance of a high degree of morale among its employees because of the reasonable employment protection and opportunity for advancement predicated upon the efficient and safe performance by such employees of their respective duties as concerns their fellow employees, the general public, and the Company.

B. *Specific Findings of fact with regard to the defendant Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees.*

1. The Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC) is the certified bargaining representative of certain employees of the Company performing the duties of positions within the craft or class of clerical employees. As shown in part by its name, this defendant railway labor organization represents a broad class of employees performing generally clerical functions and employees performing general laboring duties.

2. Included in the Government's Exhibit 8 is a copy of the current collective bargaining agreement between BRAC and the Company showing an effective date of September 1, 1949, but embodying provisions dating in general to the time prior to World War I. Rule 1 of this agreement describes the classes of specified groups of employees represented and the Groups within which certain positions are classified.

Group I clerks are shown to be described as (a) clerical workers, and (b) machine operators. In Group 3 are positions wherein the duties are performed by, among others, baggage and mailroom employees, mail separators, tractor and/or truck drivers, storage car loaders, mail handlers, baggage handlers, parcel room baggage handlers, other than clerks; Red Cap porters; all employees in Stores Departments, not doing clerical work, and any labor used in and around station storehouses, etc. not covered by other agreements.

3. Rule 2 of the BRAC agreement defines "clerical workers" as employees who are regularly assigned to clerical work, or who devote not less than four (4) hours per day to the writing and calculating incident to keeping records and accounts, stocks, rendition of bills, reports, statements, selling tickets, giving information to the public, making reservations, checking yards, directing the handling of baggage and mail, checking of baggage and delivering baggage, checking parcels and other similar work; handling correspondence, and other similar work requiring clerical skill.

4. Clerical positions have been established by the Company in most of its departments to perform the necessary "office" or clerical work, and each such position is covered by the BRAC agreement.

5. In the Company's Ticket Office, Group 1 clerical positions include cashier, accountant, ticket and baggage clerk, and gatemen; in its Mail and Baggage De-

partment Group 1 clerical positions are General Foreman, Foreman, Assistant Foreman, Chief Clerk, and Steno-Clerk; in its *Accounting and Purchasing* Department, Voucher Clerk, Assistant Storekeeper, Invoice Wheel Clerk and Stockmen.

6. Group 3 laboring positions coming under the BRAC agreement have been established by the Company in various of its departments, such as the positions of Mail Separator, Tractor Driver, Loader, and Porter in its Mail and Baggage Department; Storehelpers and Laborers in its Accounting and Purchasing Department, and Red Caps in the Transportation Department.

7. The BRAC agreement with the Company provides under Rule 3 that the seniority of an employee in a position covered by the agreement begins at the time the employee's pay starts in the seniority district and in the class to which assigned.

8. Rule 3 of the same agreement also provides that employees promoted to Group 1 positions from Group 3 positions will be allowed to retain their seniority dates.[55]

9. Rule 4 of the BRAC agreement provides that:

Employees covered by these rules shall be in line for promotion. Promotion shall be based on seniority, fitness and ability; fitness and ability being sufficient, seniority shall prevail.

NOTE: The word "sufficient" is intended to more clearly establish the right of the senior clerk or employee to bid in a new position or vacancy where two or more employees have adequate fitness and ability.

10. Rule 4 of the BRAC agreement as above set forth prior to its amendment in November 1962, contained the following additional provision at the end of the paragraph before the NOTE:

[E]xcept, however, that this provision shall not apply to excepted positions or to paragraph (4) of Rule 2.

11. Rule 1 of the BRAC agreement under the caption EXCEPTIONS provides that certain positions which would be covered by the BRAC agreement are removed from coverage by the provisions of the agreement, or in the jargon of the industry "excepted" from the application of the agreement, because of their confidential relationship to management. The excepted positions at the Company include all employees in the Office of the President-General Manager, and in that of the Assistant General Manager, and the additional positions of Comptroller, Ticket Agent, General Mail and Baggage Agent and his assistant.

12. The reference to "paragraph (4) of Rule 2" in Rule 4 of the BRAC agreement prior to its deletion in 1962, was to employees covered by Group 3 of Rule 1 as set forth earlier herein.

13. The Government contends that the intent of that portion of Rule 4 of the agreement, which, as stated, was eliminated in 1962 and prior to the effective date of the Act, was to deny promotions to employees holding Group 3 positions. Support for this contention is claimed by the Government from Government Exhibit 12, constituting a copy of a letter written in April 1962 by the BRAC General Chairman to the Grand President of that union stating that the part of Rule 4 to be eliminated meant "that employees covered by Group 3 (all Negroes) will not be in line for promotion".

14. Evidence in regard to the interpretation and application of Rule 4 prior to and after its amendment in 1962 is provided by the testimony of the Company's Manager of Personnel and Claims (W. Q. Smith) and of the Company's General

---

55. Rule 3, paragraph 4 provides: Clerks holding Group (1) positions who were promoted from Group (3) positions shall be permitted to return to Group (3) positions in the Department from which promoted when by the exercise of seniority they can no longer hold a position in Group (1), provided their return to Group (3) will not displace an employed older in service in that Group.

Mail and Baggage Agent (G. G. Jones). This testimony is to the point that the Rule prior to amendment was interpreted as meaning the holders of "excepted" positions, and the holders of Group 3 positions, would not be entitled to promotions on a bid basis as a matter of contract right because of seniority, fitness and ability as provided for in the case of holders of Group 1 positions. Thus, employees in excepted and Group 3 positions could be promoted without regard to seniority, fitness or ability.

15. Additional support for that interpretation of the Rule prior to its amendment, is found in the above-stated provision in Rule 3, applicable also since 1949, that employees promoted from Group 3 positions to Group 1 positions retain their Group 3 seniority dates as concerns positions therein. No provision is made in the BRAC agreement for an employee holding a Group 1 position to acquire seniority in Group 3 positions unless he was promoted from one of such positions.

16. The Court finds that the Government has failed to prove that the Company interpreted and applied Rule 4 prior to its amendment in 1962 as barring promotion of any holder of a Group 3 position, and that the contemporaneous provision in Rule 3 of the BRAC agreement (described above) would have been meaningless if such was the intent of the Rule as set forth in the agreement from 1949 to 1962.

17. Rule 6 of the agreement provides the procedures for "bidding" on newly created positions and job vacancies, for the posting of "bulletins" of such job openings, and the right of employees within the seniority district wherein such vacancies occur to file applications therefore. This rule also provides that if no employee in a district bids on a vacancy therein, employees covered by the agreement in other seniority districts may file applications therefor, and, if promoted to a position within the same class (Groups), may carry with them one-half of their seniority not to exceed five (5) years.

18. Rule 6 also provides that preference in regard to promotions will be given by the Company to employees covered by the BRAC Agreement over non-employees.

19. The seniority rule in the BRAC agreement granting seniority only to the classes of employees represented provides job security for such employees over other employees whose employment experience at the Company has been in crafts and classes of work unrelated to the work of clerical employees.

20. The seniority rule in the BRAC agreement by providing job security to employees of the Company within the class in which they work allows the Company to retain a stable, experienced and thus efficient force of clerical and related employees competent to fulfill the needs of the Company in the positions covered by the agreement.

C. *Specific Findings with regard to the defendants Brotherhood of Locomotive Engineers, and United Transportation Union (UTU(E)).*

1. The defendant Brotherhood of Locomotive Engineers (BLE), is a railway labor organization that represents the employees of the Company working in the craft of locomotive firemen, hostlers and hostler-helpers (firemen). The defendant union UTU(E) (the former Brotherhood of Locomotive Firemen and Enginemen (BLF & E)) represents the craft of locomotive engineers. The crafts of firemen, hostler-helpers, hostlers and engineers cover such job titles in the Transportation Department of the Company.

2. In the railroad industry, including the Company, the representation of employees by labor organization is and for many years has been on the basis of crafts or classes of employees. These crafts have been recognized by the National Mediation Board and the railroads as crafts or classes of employees within the meaning of the Railway Labor Act. There are, and for many years have been, two separate crafts of engine service employees at the Company and in

the railroad industry whose basic duties are confined to service in the cabs of locomotives. These crafts are the craft of locomotive engineers and the craft of locomotive firemen which include the classes of hostler-helpers and hostlers. There are no other crafts or classes of employees or jobs at the Company that are similar in duties, skills required, or functions performed, to the crafts and jobs in engine service.

3. The BLE is and for many years has been the duly designated and authorized representative of the craft of locomotive engineers on most of the other railroads in the United States, including the major rail carriers.[56] The BLE also represents the craft of locomotive firemen on certain railroads in the United States including the Company. The former Brotherhood of Locomotive Firemen and Enginemen, now merged into UTU(E), is and for many years has been the duly designated and authorized representative of the craft of locomotive firemen on most of the other railroads in the United States. The former BLF & E also represents the craft of locomotive engineers on certain railroads in the United States.

4. The basic rules and working conditions of these engine service crafts, including seniority regulations, are contained in the collective bargaining agreement entitled Rates of Pay and Regulations effective February 1, 1949 (Exhibit 8). Many of the provisions of the 1949 basic contract have been superseded and modified by supplemental agreements. In the railroad industry, and at the Company, the collective bargaining agreements are without a termination date and the basic agreement is modified by supplemental agreements without a complete revision of the basic agreement. It is not unusual in the industry for basic agreements to not be completely revised for many years. There are also a number of national agreements negotiated by the craft unions on an industrywide basis

that are applicable to employees of the Company covering such items as wages, vacations, holidays and health and welfare benefits. The representation of the engine service crafts at the Company has changed over the years between the BLE and the former BLF & E. Even though the craft of locomotive firemen is now represented by the BLE, and the craft of locomotive engineers has been represented by the former BLF & E since September 1967, the basic collective bargaining agreement of 1949 remains in effect.

5. Defendants BLE and UTU(E) do not maintain a hiring hall, or a job referral system or in any manner refer individuals for employment in the crafts of engineer and firemen. The carrier had and has control over the hiring of firemen and engineers, and BLE and UTU(E) do not participate in this selection. There is no union shop agreement covering the engine service crafts and employees are free to join or not join either the BLE or UTU(E). Some of the employees working in the crafts represented by BLE and UTU(E) are not members of the organization that represents the craft.

6. Employment and promotion at the Company in engine service have declined drastically since 1964. The award of Arbitration Board No. 282, pursuant to Public Law 88–108 (77 Stat. 132) authorized the Company to terminate the employment of about 12 firemen in 1964. At present, there is only one fireman job at the Company. The engine service employees who are now employed are all protected under the arbitration award by being guaranteed engine service employment. Not all of the employees listed on the engine service seniority rosters are presently employed by the Company. The employee with the lowest position on the fireman hostler-helper seniority roster who is presently working has a seniority date of 1951. Since 1964, some men have been hired in engine service

56. Two international officers of the BLE and UTU(E) testified as to the collective bargaining agreements of these Unions with the nation's railroads and the similarity of the Company agreements with respect thereto.

primarily as "hired engineers" under the agreement. All such new employees had engine service experience with other railroads. In addition, in 1967, a few men, white and Negro, were hired as firemen hostler-helpers. However, all of these employees hired since 1964 have subsequently left engine service because of a lack of work. Three employees have worked in emergency as firemen hostler-helpers since 1965. These white employees did not acquire seniority for this temporary emergency service.

7. There are three separate seniority rosters for these crafts for: 1) firemen and hostler-helpers; 2) hostlers; and 3) engineers. (Exhibit 9). The engine service jobs are filled from the employees on the seniority rosters for these crafts.

8. The collective bargaining agreements between the Company and the BLE and the former BLF & E provide for craft seniority in the crafts of locomotive engineer and locomotive firemen. An employee hires into and accumulates seniority in each craft separately. Employees may begin their employment with the Company in engine service by working as a fireman or hostler-helper, and are placed on the fireman's seniority roster according to the date they begin work as a fireman. As the need for additional engineers develops, firemen when qualified may be called to work as an engineer and acquire a seniority date as an engineer. There is no absolute bidding right for a fireman to bid on an engineer's job until he has been qualified and called to work as an engineer and he has thus acquired engineer seniority. Qualified men may also be hired directly into the engineer craft and acquire engineer seniority as so-called "hired engineers". The evidence establishes that there is no rigid line of progression in the engine service crafts. Although an employee may progress from fireman and hostler-helper to hostler to engineer, an employee with qualifications may be hired into any job. Under the terms of the agreements, the Company has hired qualified engineers directly into the craft of engineers.

9. Firemen who are promoted to engineer retain their fireman's seniority rights and employees in engine service who are hired engineers are also placed on the fireman's seniority roster. This enables these employees to flow back and forth between the jobs in these crafts until they are able to work full time as an engineer. This arrangement provides for a stable engine service work force for the Company and stable employment for these employees. It is to the Company's advantage to have such trained employees available when they are needed and the skilled employees have an opportunity to work in a related craft when engineer jobs are not available.

10. The collective bargaining agreements do not allow an employee to transfer his seniority from another craft upon entering one of the engine service crafts and do not provide for credit for seniority earned in any craft outside of engine service. These rules, and previous similar rules governing the engine service crafts, have been consistently applied over the years to all employees regardless of race upon entering the engine service crafts. Many present white employees on the engine service seniority rosters have forfeited other Company seniority upon entering engine service. The Court specifically finds that these collective bargaining agreement rules apply uniformly to all employees who enter engine service and do not discriminate against Negro or white employees of the Company who desire to transfer to jobs in the engine service crafts. The agreement rules do not prevent the Company from considering any Company employee, Negro or white, for new hires in the engine service crafts.

11. These craft seniority rules are applied in a non-racially discriminatory manner, and are of benefit to the employees in each craft. These craft seniority rules in the Company agreements are essentially similar to those contained in agreements in force on other railroads in the United States pertaining to the craft of locomotive engineer and fireman.

12. The craft seniority rules can be directly traced back to the Chicago Joint Agreement of 1913 between the BLE and the former BLF & E, and were in effect on some U. S. railroads even prior to 1913. These rules provided for: separate craft seniority for firemen and engineers dating from the date of their first service as fireman or engineer, promotion examinations, and the hiring of so-called hired engineers. These rules did not provide for the transfer of seniority from any other craft or job on the railroad or the retention of seniority in any other craft or class of the railroad. These craft seniority rules evolved through collective bargaining and the 1913 Chicago Joint Agreement and were made uniform and nationally applicable during the Federal control of the nation's railroads by the U. S. Railroad Administration. On September 1, 1919, the Director General of Railroads adopted the provisions of the Chicago Joint Agreement pertaining to craft seniority, and they became binding upon all railroads under Federal control, including the Company. By a collective bargaining agreement dated February 1, 1920, the rules of the Chicago Joint Agreement, as approved by the Director General of Railroads, were formally adopted into the agreements of the Company.

13. The only present acts and practices placed in issue by plaintiff relate solely to the provisions of collective bargaining agreements which do not permit an employee in another craft to transfer his seniority to a job in the engine service crafts and thus allegedly discriminate against Negro employees who desire to transfer to jobs in the engine service. However, the Court finds that these craft seniority rules are based on seniority practices of the railroad industry that developed over 60 years ago, apply uniformly to all employees, and do not racially discriminate. These contract provisions and acts and practices, applied equally to employees of all races, do not constitute acts of discrimination in employment.

14. The collective bargaining agreements covering the engine service crafts have long provided for examinations for promotion to hostler and engineer. The contents, administration, and grading of the examinations are determined by the Company. These examinations are directly related to the qualifications necessary for the performance of the jobs of hostler and engineer. There was no evidence that these examinations or contract provisions relating thereto were intended, used or administered in any racially discriminatory manner.

15. The Government referred to canceled and superseded provisions of the collective bargaining agreements governing the engine service crafts that related to establishment of extra boards and posting of seniority rosters. However, the Government failed to show that these provisions, canceled prior to July 2, 1965, were intended, applied or used to limit or deny any right or privilege of employment to Negro engine service employees. These provisions have had no effect on working conditions or employment rights subsequent to their cancellation. The Government also referred to terms of ancient collective bargaining agreements of the former BLF & E covering the craft of firemen, dating from 1930 and 1935 which were completely canceled in 1949. The Court specifically finds that there has been no effect or application of these agreements since they were canceled in 1949 and they are not relevant to any issue in this action.[57]

16. The term "promotable" as used in the engine service agreements is synonymous with the term "qualified", without regard to race. The term "non-promotable" has not been applied or used to limit or classify Negro employees nor to exclude Negroes from engine service jobs, and has not been used to deny Negro employees equal employment opportunities. The Court finds that at all material

---

57. One Negro witness of the Government, who retired in 1966 from a fireman's job, was obviously not qualified to be an engineer since he could not read or write.

times no Negro has been treated as non-promotable or excluded from engine service because of his race. A Negro, J. W. Butts, Jr., was hired as a fireman in 1967, and worked from the fireman's extra board.

17. One employee, J. E. Pickens, a Negro employed in the mechanical department as a car cleaner, placed a bid on the only fireman job at the Company when it was bulletined on November 25, 1969. The job was awarded to an employee on the firemen hostler-helpers seniority roster who was also a qualified engineer, and who was a protected employee required to be used by the Company. The fact that a job was put up for bid did not indicate that there was a need for additional men in the craft at that time. No new men have been placed on the firemen hostler-helper seniority roster since 1967, and those employees hired in 1967 are now not working due to reduction in forces. Mr. Pickens, who had worked in emergency during the war period of 1945 as a fireman, expressed interest in fireman work but was not on the seniority roster. However, he did not contact the Superintendent of Transportation as he was advised to do; he was not aware of the requirement for promotion examinations for hostler and engineer; and he was not sure he would want to work as a fireman under these working conditions of the craft. The failure to award the job bulletined on November 25, 1969, to Pickens was not an act of racial discrimination in violation of the Civil Rights Act of 1964.

18. The defendants BLE and UTU (E) are not now, and since July 1, 1965, have not been, parties to any collective bargaining agreement with the defendant Company which provides for or tends to perpetuate any discriminatory act or practice described in the complaint. These defendants are not now and since July 1, 1965, have not participated in or cooperated with the defendant Company in any act or practice providing, designed for, or resulting in, discriminatory acts and practices affecting Negro employees of the defendant Company as alleged in the complaint.

19. In conclusion the Court finds that:

(a) There was no proof at trial by the Government of present and repeated instances of unlawful employment practices by the BLE and UTU(E) in violation of 42 U.S.C. § 2000e et seq.

(b) The collective bargaining agreements between the defendants BLE and UTU(E) and the Company do not contain any provisions which perpetuate or tend to perpetuate the effects of any alleged discriminatory acts and practices.

(c) The defendants BLE and UTU(E) are not engaged in acts and practices which constitute a pattern and practice of intentional resistance to the full enjoyment of the rights of Negroes to equal employment opportunities secured by the Civil Rights Act of 1964.

D. *Specific Findings with regard to the defendant Railway Employees Department AFL–CIO, System Federation No. 50, (Shopcraft Unions).*

1. The employees in the Company's Mechanical Department are represented by the International Brotherhood of Firemen and Oilers (IBFO); the Brotherhood of Railway Carmen of America (BRCA); the International Brotherhood of Electrical Workers (IBEW); the International Association of Machinists and Aerospace Workers (IAMAW); the Sheet Metal Workers International Association (SMW); and the American Railway Supervisors Association (ARSA), collectively referred to as the Shopcraft Unions. These defendant unions are all affiliated with the Railway Employees Department, AFL–CIO (R.E.D.), which defendant union through its subordinate body System Federation No. 50, is the collective bargaining agent for the employees who are members of the Shopcraft Unions, and represented by one of said unions.

2. Under the terms of the basic collective bargaining agreement between defendant System Federation No. 50 and the Company, negotiated April 16, 1939,

and to remain in effect until revised in accordance with the Railway Labor Act, seniority rights of the so-called shop-craft employees at the Company, who are employed in the Mechanical Department, are generally limited to the craft in which employed, and employees may not hold seniority in more than one job classification simultaneously.

3. Seniority dates only from the first day of assignment to a regular position in that job classification. An employee who quits, or transfers to a different job classification within his craft or to work within a different craft, loses his seniority in his former job classification.

4. An employee furloughed (laid off because of lack of work) may hold his seniority while transferring to another job classification, but when work is again available in his former classification he will lose his former seniority if he does not respond to a recall from furlough.

5. Exceptions to the foregoing limitations are that in all of these crafts, employees are permitted to retain their seniority in their former job classifications when promoted to supervisory jobs (foreman) in the Mechanical Department, although the latter jobs constitute a separate craft or class under the Railway Labor Act which is represented by defendant American Railway Supervisors Association; and that in the electrical workers' craft (IBEW) electrician helpers promoted to positions as journeymen electricians, under a special upgrading agreement negotiated July 1, 1942, have retained seniority as helpers after acquiring seniority dates in the journeymen's job classification.

5(a). Additional exceptions to the foregoing limitations are that:

(i) Employees promoted to Carmen Helper from Car Cleaner or Ice and Watermen retain their seniority on the Car Cleaner-Ice and Waterman seniority roster.

(ii) Employees promoted to Fuel Oil Pumper-Water Treater from Common Laborer retain their seniority on the Common Laborer seniority roster.

(iii) Employees promoted to Machinist Helper from Fuel Oil Pumper-Water Treater or Common Laborer retain their seniority on the Fuel Oil Pumper-Water Treater or Common Laborer seniority roster. (Gov't. Exhibit 9).

6. There are no mandatory lines of progression for any of the crafts of employees in the Mechanical Department, nor any requirement of employment in one job classification as a condition precedent to employment in another job classification. Employees may be hired directly into any job classification for which they possess the requisite qualifications, irrespective of prior service with the Company.

7. Employees in the Mechanical Department crafts do not have the right to progress to a higher job classification on the basis of seniority accumulated in a lower job classification. Apprentices who complete their training in their respective crafts have no contractual right to employment thereafter, and if not retained by the Company as journeymen they do not have any seniority rights, and are free agents.

8. The Government has introduced no evidence, by proof as to work content of jobs or otherwise, which would form a basis for questioning the existence of a true functional distinction between each craft of employees and each job classification in the Mechanical Department. There are no "dual jobs", or classifications based on race, or any overlapping jobs. The dividing lines are drawn on the basis of work content of the respective job classifications, spelled out in detail in the "classification of work" rules of the System Federation No. 50 agreement, and the relative levels of skill of the various job classifications.

9. Journeymen mechanics perform the skilled, mechanical work in each of the crafts under the System Federation No. 50 agreement, with the work in the respective crafts being differentiated largely along the lines of the traditional trades. Under the agreement these journeymen mechanics must either have

served an apprenticeship or have accumulated four years actual experience at journeyman mechanic's work and be able to satisfy management as to their ability. The latter requirement might be met by accumulated time served on temporary assignment to this type of work when no qualified mechanics are available, or by experience in outside industry.

10. The work of helpers in each of the crafts is specified in the System Federation No. 50 agreement. They for the most part just "help" the mechanics in the craft, fetching and carrying tools and materials, and lifting and assisting on heavy work, and actually perform only limited and semi-skilled mechanical work of the particular craft. Thus, for example a machinist helper does not use wrenches. No formal contract qualification requirements are imposed for employment as a helper, although the Company has usually required helpers to be able to read and write.

11. Apprentices actually perform the various mechanical functions of the particular trade, under the supervision and instruction of qualified journeymen, in a planned four-year training program which, if satisfactorily completed, qualifies them as journeymen. Apprentices are required to read and write and understand the first four rules of arithmetic, but no other particular training or experience is required for entry into an apprenticeship program.

12. The work of car cleaners and ice and watermen, represented by the Carmen's Brotherhood (BRCA) and of shop laborers and fuel oil pumpers represented by the Firemen and Oilers Brotherhood (IBFO) is generally unskilled, at the common labor level, with no formal qualification requirements for employment.

13. On July 1, 1942, to cope with a shortage of journeymen during World War II, an agreement covering the electricians' craft was negotiated by the System Federation, which permitted electrician helpers with four years experience in their craft to be upgraded or promoted to positions as electricians while retaining their seniority as helpers, and in the application of the agreement over the years helpers so promoted have been given seniority as electricians. The Company does not maintain an apprentice training program for electricians, but has used the 1942 helper promotion agreement as a substitute. The nature of the work of the electrician craft is such that a helper must perform more actual work of the trade than is true of other crafts, in working with the journeyman as a team, and so receives training to be a journeyman electrician.

14. The Company has obtained approximately half of its current force of journeymen electricians by promotion of helpers under the 1942 agreement, and half by direct hire of qualified journeymen. No electrician helpers are presently employed, and the most recent additions to the electricians' force have been by direct hire, no helpers having been promoted under the 1942 agreement since July 15, 1965.

15. There is no evidence that any Negro has ever applied for or sought to transfer to a position as electrician apprentice, electrician helper or electrician. There is no evidence that had a qualified Negro applied for any of these positions he would have been rejected. There is no evidence that qualified Negro electricians have ever been available for direct hire by the Company.

16. Due to declining business, the Company no longer maintains an apprenticeship program in any of the crafts comprising System Federation No. 50. On December 1, 1969, due to the Company's inability to fill a sudden need for journeymen machinists, an agreement was made permitting helpers in the crafts of machinists and carmen to be temporarily assigned to such mechanic's work as they might be capable of, at the mechanic's rate of pay, so long as qualified journeymen were unavailable.

E. *Specific Findings with regard to the defendant United Transportation Union.*

1. The findings with respect to the United Transportation Union (UTU) will apply equally to the defendant Brotherhood of Railroad Trainmen (BRT) which latter union was merged into the UTU at a recent date, and which is the certified bargaining representative to the agreement with the Company covering the craft of train service employees, and at the Company the positions of Conductors (Yard Foreman) and Switchmen (also until recently abolished, the positions of Back-Up Foremen).

2. Employees occupying these positions are collectively referred to as Yardmen in the Agreement dated June 15, 1945.

3. The agreement provides (Article 11(a)) that new assignments and permanent vacancies will be bulletined for one (1) day, and the assignment or vacancy will be given to the senior Yardman in service making application in writing. Article 11(c) provides that a Yardman failing to make an application for a new assignment or vacancy forfeits his promotion to such vacancy or assignment.

4. The agreement also provides that the seniority rights of Yardmen shall commence on the date and hour employed.

5. By a prior Special Agreement dated July 12, 1940, which has continued to be recognized by the Union and the Company, Switchmen promoted to Conductors carry to the latter position their earlier Switchmen's seniority dates.

6. The agreement provides job security for the Yardmen covered in that they cannot be displaced from their jobs by any employee who does not possess greater seniority in their respective positions.

7. The maintenance by Conductors of their earlier seniority dates as Switchmen serves a useful business purpose by permitting the Company to use Conductors as Switchmen when the volume of operations declines and the number of switch crews—usually composed of a Conductor and two (2) Switchmen—is reduced.

8. The provisions of the agreement do not apply in any different manner to employees because of their race.

9. As found by the Court with respect to the Company the provisions of this agreement have not caused the Company to engage in any act or practice in violation of the Act.

10. Under the operations of the Company, and of the railway industry generally, experience as a Switchman is necessary to obtain the qualifications for promotion to the position of Conductor. However, both positions can be entering jobs in the employ of the Company based upon the qualifications and past experience of the applicant.

F. *Specific Findings with regard to the defendant Brotherhood of Maintenance of Way Employees.*

1. The defendant Brotherhood of Maintenance of Way Employees (BMWE) is the certified bargaining representative of certain employees at the Company performing the duties of jobs classified as Bridge and Building, (B & B), carpenter, (B & B) pipefitter, B & B painter, Roadway (Rd.) welder, Rd. welder mechanic, Rd. welder helper, Rd. machine operator, and B & B and Roadway laborers.

2. The Company's Maintenance of Way Department is divided into two sub-departments, the Bridge and Building sub-department and the Roadway sub-department. As indicated by its name, this department is responsible for the maintenance of the Company trackage, rights of way and most of its structures.

3. As of August 6, 1969, the Company employed in its Bridge and Building sub-department one foreman, three carpenters, one pipefitter, one painter, one helper and laborer. In the Roadway sub-department the Company employed two foremen, one welder, one welder mechanic, three welder helpers, one machine operator and 11 laborers.

4. The positions of carpenter, pipe-fitter, etc., are classified by the Company as craftsmen's positions requiring some experience and skills to capably perform the required functions of each such position.

5. The Company classifies the position of welder and welder mechanic as positions requiring specific skills for the safe performance of hazardous duties.

6. The function of the helper in the Bridge and Building Department is to help one of the skilled employees, particularly the carpenter in the performance of the carpenter's duties. The position of laborer within the Bridge and Building sub-department is simply to perform unskilled laboring duties as directed by a craftsman employed in the department.

7. The position of the welder helper within the Roadway sub-department is to assist the welder, in duties other than the use of welding equipment. The position of laborer is an unskilled job simply requiring the performance of duties as directed by one of the skilled employees within the Roadway sub-department.

8. The Government's Exhibit 8 includes a copy of the current agreement between the Company and BMWE bearing an effective date of September 1, 1949.

9. Rule 3 of the contract between the Company and BMWE provides that seniority in each sub-department will commence from the day of service in each such sub-department and will be confined to the sub-department in which employed. Seniority is not transferable between sub-departments or to any other department of the Company.

10. Rule 2 of the agreement provides that new positions and vacancies will be bulletined for a period of forty-eight hours and appointments to new positions or to fill vacancies will be made on the basis of seniority of the employee within each sub-department and the senior bidder will be given three days to qualify. If he fails to qualify, the bidder will be allowed to return to his previous position.

11. Employees promoted to higher positions in either of the sub-departments continue to maintain their seniority dates in the positions from which advanced or promoted, and establish new seniority dates in the positions to which advanced or promoted.

12. There are no requisite "lines of progression" within the Company's Maintenance of Way department, and an employee or applicant possessing the requisite skills and previous training may be promoted or hired by the Company into any one of the positions in this Department.

13. The seniority rules of the defendant union BMWE provide job security for the employees represented and enable the Company to maintain an experienced work force necessary to perform its responsibilities as an interstate common carrier by railroad in a safe, economical and efficient manner as required by Federal statutes.

G. *Specific Findings of fact with regard to other union defendants.*

1. The Court has found that the Government failed to prove that the employment acts and practices of the Company relating to those classes of employees as to which the Government introduced evidence, constituted acts and practices proscribed by the Act.

2. Findings have been made also that the collective bargaining agreement covering each of these classes of employees did not cause, or perpetuate the effect of, a discriminatory employment act or practice by the Company.

3. The Court finds that the Government failed to introduce any evidence with respect to employment acts and practices relating to other classes of employees, and accordingly the collective bargaining agreements of the following union defendants also are found specifically not to cause, or perpetuate the effect of, any act or practice proscribed by the Act:

Railroad Yardmasters of America (RYA)

Transportation Communication Employees Union (TCU)

The American Railway Supervisors Association (ARSA)

The Brotherhood of Railroad Signalmen (BRS)

International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (Boilermakers)

Sheet Metal Workers International Association (SMW)

and

International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers (IBFO)

H. *Specific Findings of fact with respect to the issue of membership in separate local lodges.*

1. In paragraph 8 of its complaint the Government contended that the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC); the Brotherhood of Maintenance of Way (BMWE); and the Brotherhood of Railway Carmen of America (BRCA), each maintain racially segregated locals, which practice deprives Negro members of employment opportunities and adversely affects their status as employees because of their race. In its prayer for relief the Government seeks an injunction against this alleged discriminatory employment practice.

2. At the time of the trial employees of the Company represented by the defendants BRAC and BMWE held membership in their respective Brotherhoods in one or another of two local lodges. In the case of BRAC, the membership of Local No. 1014 was predominantly non-Negro employees, and the membership of Local No. 1575, was predominantly Negro employees. BMWE Local No. 539 was comprised entirely of white employees and Local No. 2029 consisted entirely of Negro employees of the Company.

3. Employees represented by the defendant BRCA held membership in separate local lodges at the time the suit was filed, but these locals were merged effective October 1, 1968, and no evidence was presented by the Government with respect to this defendant Brotherhood on the issue of membership in separate local lodges.

4. The separate local lodges for BRAC and BMWE were originally chartered at a time when the constitution and bylaws of each of said defendant unions limited Negro membership to auxiliary lodges, but these constitutional provisions were repealed in 1947 and 1946, respectively.

5. In the case of each union, members of either lodge are presently entitled to transfer to the other lodge if they so desire.

6. The Government produced no evidence to show that Negro members of local lodges in either the BRAC or BMWE have attempted to terminate the separate existence of their respective local lodge or to effect a merger of their lodge with another local lodge in either brotherhood.

7. In October, 1969, members of each Negro local lodge of the BMWE in the Seaboard Federation, with which Local No. 2029 is affiliated, were asked to vote as to whether they desired to merge their lodge with the nearest lodge consisting of white employees. As of the date of the trial 15 of 21 such lodges had voted against such merger, including the members of Lodge 2029, the lodge to which Company employees belong. Five of the lodges had not yet communicated the results of the vote and only one lodge, that including employees of the Florida East Coast Railway Company, had voted in favor of a merger.

8. The BRAC and BMWE and not the local lodge are the collective bargaining representative of Company employees in the respective crafts and classes they represent. None of the local lodges negotiates collective bargaining agreements or has the authority to do so under the Railway Labor Act, or under the laws of either of said defendant unions. The sole function of the local lodges with respect to employment rights of their mem-

bers consists of the receiving and filing of grievances at the initial level. Agreements are negotiated by system or national officers of the brotherhoods acting for all locals and the members of each local lodge has the right to vote in the election of such representatives.

9. None of the local lodges of the defendant labor organizations operates a hiring hall or a job referral system or has any function in the matter of referring prospective employees to the Company for hiring. There are no closed-shop agreements in effect at the Company, such agreements being outlawed by Section 2 of the Railway Labor Act. Under the union-shop provisions of that Act an employee may only be required to join a labor organization 60 days *after* he is employed. It is employment in a position in a particular craft or class that determines which labor organization an employee may be required to join as a condition of his *continued* employment.

10. Members of the BRAC and BMWE local lodges have equal rights with respect to voting, selecting system negotiating committees, division and general chairmen, and delegates to system and national conventions. The present Division Chairman who represents both BRAC locals in the handling of grievances is a Negro. In the case of the BMWE grievances have customarily not been handled at the local level but simply forwarded by the local lodge to the General Chairman of the Seaboard Federation for handling. On that Seaboard Federation Negro employees have superior voting power both from the point of view of number of locals on the Federation and number of members, and votes are cast on the basis of the total membership in each local lodge.

11. There was no evidence of any instance in which a white local lodge or local union officer negotiated a collective bargaining agreement on behalf of Negro members of a separate local lodge. The only instance in which the Government urged there was such a showing related to an agreement executed in 1963 by the local chairman of the Protective Committee of Lodge No. 1575 at the request and direction of the General Chairman. This memorandum of understanding concerned the procedures to be followed in applying a portion of a previously negotiated nationwide agreement which dealt with the use of furloughed employees to perform extra or relief work (the Chicago Agreement of August 21, 1954). The execution of the memorandum of understanding of February 11, 1963, by the chairman of their own lodge after its negotiation by the General Chairman did not operate to discriminate against Negro members of the local or adversely affect their employment opportunities.

12. The Government failed to prove that any local lodge of any of the defendant labor organizations has refused to admit Negroes to membership because of their race at any time material to this action. Prior to 1960 the constitution of the defendant Brotherhood of Railroad Trainmen (BRT), which is now a part of defendant United Transportation Union (UTU), contained a provision restricting membership in that union to persons of the white race. That provision was eliminated in 1960. Since that date no Negro Switchman or any other Negro employee of the Company represented by the BRT (later part of UTU) has applied for membership in BRT local lodge 624–T. Prior to 1960 the BRT did not attempt to enforce the union shop agreement as to Negro employees because of the restriction in its constitution. Subsequent to that date it has not sought to enforce the union shop agreement as to Negro employees because the General Chairman felt that it would be unfair to force them to join at the expense of making up contributions to the Funeral Benefit Fund in the local lodge, which contributions were required of all lodge members and which amounted to $2.00 a month for every month of the employee's age over 50 years. In May of 1969 participation in the Funeral Benefit Fund became optional, so that employees represented by BRT may now join the local

without being required to make the retroactive contributions. The Court finds that the failure of the defendant BRT and UTU to force Negro Switchmen to become members does not operate to discriminate against them because of their race or to adversely affect their employment opportunities. The Court further finds that membership in the UTU local is available to such Negro employees and they have not sought to become members.

13. The Court specifically finds that at all times material to this action none of the above-described defendant labor organizations has limited, segregated or classified its membership in any way which would deprive or tend to deprive any individual of employment opportunities or would limit such employment opportunities or otherwise adversely affect his status as an employee or applicant for employment because of such individual's race. The separate BRAC and BMWE local lodges have existed on a voluntary basis since 1947 and 1946 respectively. Those defendant Brotherhoods have not maintained separate locals since those dates in any sense other than failure to actually revoke local charters or to force a merger of the locals, a power not given to the unions national officers except for good cause shown.

14. The Court further specifically finds that the local lodges do not have jurisdiction or control over jobs at the Company, and the separate BRAC and BMWE local lodges have not been used or are being used as devices of discrimination with respect to hiring, promotion, job assignment or any other aspect of employment of the Company.

## VI. CONCLUSIONS OF LAW AS TO THE DEFENDANT COMPANY

1. The Court has jurisdiction of this action pursuant to Section 707 of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-6, whereby the Attorney General is authorized to seek appropriate relief when he has "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title *and* the pattern or practice is of such a nature and is intended to deny the full exercise of the rights described [in Section 703, 42 U.S.C.A. § 2000e-2]."

2. The defendant Company is an employer within the meaning of Section 701(b) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e(b), and is engaged in an industry affecting commerce within the meaning of Section 701(h) of the Act, 42 U.S.C.A. § 2000e(h).

3. The defendant unions are labor organizations within the meaning of Section 701(d) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e(d), and are engaged in an industry affecting commerce within the meaning of Section 701(e) of the Act, 42 U.S.C.A. § 2000e(e).

4. All of the defendants are subject to the Railway Labor Act, as amended (45 U.S.C. § 151 et seq.), for the purposes of collective bargaining with respect to the rates of pay, rules and working conditions of defendant Company's employees.

5. The Company is subject to the Federal Employers' Liability Act, the Interstate Commerce Act and the Rules and Regulations of the Interstate Commerce Commission issued pursuant thereto, 49 U.S.C. § 1 et seq., as well as those relating to safety procedures of the Federal Railroad Administration (and the Act establishing the Department of Transportation).

6(a). The Government was required, in this civil injunction suit, (a) to prove that defendants had committed specific acts and practices of racial discrimination in employment since the effective date of the Act (July 2, 1965); (b) to prove the commission of such acts and practices independently with respect to each and every allegation contained in the complaint; (c) to prove that such specific acts and practices were intentional and such as to constitute a pattern or practice of racial discrimination as opposed to mere isolated acts; and (d) to

establish all essential elements of its case by a preponderance of the evidence in order to establish a clear right to the injunctive relief sought. Sections 703, 707(a) and 706(g), 42 U.S.C.A. §§ 2000e–2, 2000e–6(a) and 2000e–5(g). Dobbins v. Local 212, I.B.E.W., 292 F. Supp. 413, 443 (S.D.Ohio 1968). *See also* United States by Clark v. H. K. Porter Co., 296 F.Supp. 40, 113–116 (N.D.Ala.1968); 110 Cong.Rec. 13776, 14270 (1964) (remarks of Senator Humphrey). The Government failed to prove the foregoing elements of its case; and it is, therefore, not entitled to any of the relief sought.

6(b). The Court also finds that, irrespective of its failure to prove any specific acts and practices, the Government has failed to prove a pattern or practice intended to deny Negroes their employment rights and therefore is not entitled to any of the relief sought.

7. More specifically, the Government failed to prove:

(a) That race formed any basis for the Company's initial job assignment policies;

(b) That the Company's tests, their administration or action based upon the results thereof were designed, intended or used to discriminate because of race;

(c) That racial discrimination was a reason that the Company adopted and applied the respective seniority systems of the various collective bargaining agreements to govern, where applicable, employee advancement or transfer opportunities;

(d) That, where a particular seniority system was not controlling, the Company ever advanced or transferred a less qualified white employee and denied advancement or transfer to a better or equally-well qualified Negro employee on the basis of race;

(e) That the Company ever restricted admission to whites only or ever refused to assign any qualified Negro applicant to its Apprenticeship or Electrician Helper programs or that any Negro, in fact, ever applied for such a position;

(f) That the contract provision granting preference to sons of employees for entry into the apprenticeship program (Rule 33) ever, in fact, operated to prefer a white applicant over a Negro applicant or operated to deny admission to the Apprenticeship program to any Negro;

(g) That the welding equipment usage restrictions were racially motivated;

(h) That the payment of straight time wages instead of time-and-one-half rates to certain Negro employees was attributable to race;

(i) That the difference between the provisions of the 1942 Electricians Helper Upgrading Agreement and the 1969 Machinist-Carman Helper Agreement was motivated by racially discriminatory considerations;

(j) That agreements providing that steam hose could be cut by either Journeymen Carmen or Helpers was somehow racially discriminatory; or

(k) That the toilet, locker and shower facilities used by Negroes were segregated on the basis of race or adversely affected on the basis of race the employment status of Negro employees.

The Government, therefore, is entitled to no relief with respect to the foregoing or with respect to any issue raised by its Complaint, by the pre-trial stipulation and conference, or at trial. Section 706 (g), 42 U.S.C.A. 2000e–5(g).

█ 8. On the other hand, the Court concludes as a matter of law that the Company has established by a preponderance of the evidence:

(a) That neither the Company, nor any of its officials or supervisors has ever intended to discriminate on the basis of race with respect to any personnel action taken at any time material to this case and that, to the contrary, the Company's intention has been to comply with the Act;

(b) That the Company's job and job requirements are the same as those found in the craft and class system existing in the railroad industry throughout the Nation; that no two jobs in this craft

and class system are "essentially similar"; and that all such jobs may be filled by hiring a qualified individual irrespective of race;

(c) That there are no "white jobs" or "Negro jobs" at the Company;

(d) That all job qualifications or requirements are uniformly imposed upon all applicants regardless of race;

(e) That its policies with respect to initial hire and assignment have been based on only two factors—the existence of a particular vacancy to be filled and the intention to secure for such position the best qualified individual available;

(f) That its policies with respect to advancement and transfer have been consistent with the requirements of the respective collective bargaining agreement, when applicable; or, if no agreement controls, then consistent with the principle of securing the best qualified man, regardless of race, who is available to fill the job vacancy;

■ (g) That the Baggage and Mail Department Personnel Test is primarily designed to find potential clerical employees in the ranks of the Company's non-clerical baggage and mail handlers, that the test was developed by professional railroad supervisors, that the test is job-related and that it has been evaluated by a qualified industrial psychologist to be. valid for the purpose for which it is intended. *See* Griggs v. Duke Power Co., 420 F.2d 1225, (4th Cir. 1970), aff'g in part, rev'g in part 292 F.Supp. 243, 249–250 (M.D.N.C.1968); United States v. Sheet Metal Workers International Association Local Union No. 36, 416 F.2d 123, 135–136 (8th Cir. 1969); United States by Clark v. H. K. Porter Co., 296 F.Supp. 40, 71–87 (N.D.Ala.1968); and

(h) That toilet, shower and locker facilities are geographically located in the areas where particular crafts or classes work and are used primarily by members of the respective craft or class, but no facility is "closed" to any employee because of his race.

■ 9. The defendants jointly have affirmatively established by a preponderance of the evidence:

(a) That the craft and class system of jobs, variously defined by collective bargaining agreement provisions establishing classifications of work and definitions of job qualifications, is a legitimate job classification system designed to effectuate, promote and assure safety, efficiency and economy of operation for the Company and railroads throughout the Nation;

(b) That the seniority systems provided for by the respective collective bargaining agreements are racially non-discriminatory, bona fide seniority systems within the meaning of Section 703(h), 42 U.S.C.A. § 2000e–2(h);

(c) That the foregoing craft or class and seniority systems had their genesis in labor-management agreements antedating World War I, that they were adopted and made uniform on all railroads throughout the Nation by General Order No. 27, promulgated by the Director General of Railroads in 1918, that they were interpreted and reaffirmed by the various decisions of the United States Railroad Labor Board during the early 1920's and that comparable provisions are found today in agreements governing the same crafts and classes on other railroads throughout the Nation;

(d) That the departmental organization (and sub-divisions thereof) of the Company is based upon legitimate operational considerations based on the respective functional responsibilities of each department (or subdivision thereof), that such organizational structure, as modified to meet the Company's operational requirements and capabilities, is consistent with the organizational structure on other terminal companies (and, where applicable, on trunk line railroads) throughout the Nation, that such departmentalization was recognized by the Director General of Railroads at the time he standardized the craft and class seniority system to coincide with then

existing orthodox railroad departmentalization, and that such organizational structure at the Company (and on all railroads) applies in the same manner to all employees regardless of race; and

(e) That the foregoing system of craft and class seniority and the departmental organizational structure are based on legitimate business needs, are protective of the employment rights of employees, and are required in the public interest, for the safety of the Company's employees and the public. Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States by Mitchell, 416 F.2d 980, 992–993 (5th Cir. 1969); cert. denied 397 U.S. 919, 90 S. Ct. 926, 25 L.Ed.2d 100 (Feb. 24, 1970); see Whitfield v. United Steelworkers of America, etc., 263 F.2d 546, 550 (5th Cir. 1959), cert. denied 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959).

10. Defendants have also shown:

■ (a) That restrictions on the use of welding equipment contained in the agreement between the Company and System Federation No. 50 are common to shopcraft contracts found today on other railroads throughout the Nation and are imposed regardless of race to insure safety and to protect the welder's pay differential; that such provisions can be traced back at least as far as General Order No. 27 and Decision No. 222 of the United States Railroad Labor Board (August 11, 1921); and that such provisions are racially non-discriminatory and do not violate Section 703(d), 42 U.S.C.A. § 2000e–2(d); and

(b) That the former provision in Rule 33 of the System Federation No. 50 contract which granted a preference for admission to the apprenticeship program for sons of employees was a racially non-discriminatory provision which might have been, but was not shown to have been, invoked by the sons of white or Negro employees (approximately 50 percent of the Company's employees having been Negro); that such provision can be traced back at least as far as Decision No. 222 of the United States Railroad Labor

Board (August 11, 1921), and that this now repealed provision was racially non-discriminatory and did not violate Section 703(d), 42 U.S.C.A. § 2000e–2(d). Local 53, of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969) (100 percent of training program admittees beneficiaries of nepotism) is factually distinguishable and does not apply.

11. Finally, defendants jointly and severally have established that they have not intentionally engaged in any racially discriminatory employment acts or practices such as to constitute a pattern or practice of resistance to the full enjoyment of rights secured by the Act and of such a nature and intended to deny the full exercise of such rights; and that the Attorney General, therefore, is not entitled to secure the relief requested. Sections 706(g) and 707(a), 42 U.S.C.A. §§ 2000e–5(g) and 2000e–6(a). See Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States by Mitchell, 416 F.2d 980, 996–997 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (Feb. 24, 1970).

12. Furthermore, this Court concludes that the facts in this case are distinguishable from those in Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States by Mitchell, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (Feb. 24, 1970) because:

(a) The parties in *Papermakers* stipulated that pre-Act racial discrimination continued with respect to initial job assignments until at least February 1968, whereas this Court has found that no pre-Act or post-Act discrimination in initial job assignments has existed since the Company has filled all vacancies with the best qualified individual then available.

(b) The parties in *Papermakers* stipulated that the white local union "had jurisdiction over the more desirable lines [of progression] and that the Negro local had jurisdiction over the left-overs"

(this arrangement in effect establishing a referral-type hiring system and a closed shop), whereas this Court has found that none of the local unions has jurisdiction or control over any segregated lines of progression, that none of the defendant labor unions has any authority with respect to hiring of employees, that union membership does not commence until after the Company has hired an employee, that the jurisdictions of the defendant national unions relate to separate and distinct crafts or classes of employees, that the national unions have jurisdiction over negotiation of wages and working conditions of the jobs in each craft or class of employees, and that collective bargaining with respect to the rules, wages and working conditions of Company employees has been conducted by Company officials or their national representatives with national representatives of the unions, generally in the time relevant to this action, on a national basis by the railroad's National Labor Relations Conference.

(c) The parties in *Papermakers* agreed that local unions possessed complete authority, and exercised such power, to negotiate with the employer in *Papermakers* as to specific jobs which the parties had intentionally segregated as to race through the device of establishing exclusive jurisdiction over the better jobs with the "white local" and over the "leftovers" with the "Negro local", whereas in this case the evidence, while showing that Negro employees and white employees represented by the BRAC and BMWE are members of separate local lodges, clearly shows that such lodges do not possess and have not sought to exercise any authority to negotiate as to the employment opportunities or rights of their members.

(d) The parties in *Papermakers* agreed that most jobs in a paper mill required prior service at that plant in a lower job on a promotion ladder or line of progression, whereas this Court has found no job at the Company is a prerequisite for service in a more skilled position since there are no strict "lines

of progression" in the railroad industry and all railroad jobs may be filled with individuals who have gained the necessary experience on some other railroad (or, in some instances, in other industry).

(e) The parties in *Papermakers* agreed that the seniority system at the Bogulusa Plant historically and intentionally had been designed to restrict Negroes to certain lines of progression, whereas this Court has found that the various seniority systems in effect at the Company apply equally to all employees, Negro and White, regardless of race, are based upon legitimate business needs, and are *bona fide* systems comparable to systems on other railroads throughout the Nation and stemming from the Nationwide standardization of agreements resulting from General Order No. 27 and the decisions of the United States Railroad Labor Board.

Therefore, the court finally concludes that since the craft-class seniority systems and the separate local labor organizations, such as exist at the Company, had their genesis in a "reason other than discrimination on account of race * * in violation of Section [703]," Section 706(g), 42 U.S.C.A. § 2000e–5(g), *Papermakers* does not apply.

VII.

CONCLUSIONS OF LAW ON BEHALF OF UNION DEFENDANTS·

A. *General Conclusions*

1. The court has jurisdiction of this action pursuant to Section 707 of the Civil Rights Act of 1964 (Act), 42 U.S.C.A. § 2000e–6(b).

2. Each of the railway labor unions named as defendants herein is a labor organization as such term is defined in Section 701 of the Act, 42 U.S.C.A. 2000e(d).

3. Each defendant union has been "determined" to be the representative of a craft or class of employees of the Company by a vote of the majority of the employees in each such craft or class as required by the Railway Labor Act.

4. Each defendant union is the certified bargaining representative of employees of the Jacksonville Terminal Company, Jacksonville, Florida (Company), under the provisions of the Railway Labor Act, as amended, and as such is a labor organization engaged in an industry affecting commerce, as provided in Section 701, of the Act, 42 U.S.C.A. § 2000e(e).

5. Each of said defendant unions is a party to a collective bargaining agreement negotiated with the Company to protect the employment rights and opportunities of the class of employees represented as required by the provisions of the Railway Labor Act.

6. Each such collective bargaining agreement now in effect between each of said defendant unions and the Company contains provisions setting forth the rules, wages, and working conditions of a craft or class of employees as required by the Railway Labor Act.

7. The provisions of each of the collective bargaining agreements providing for the acquisition of seniority by employees in jobs the duties of which they perform, and the use of such seniority in connection with skills acquired through performance thereof, represent an essential element of the craft and class system of employee representation under the Railway Labor Act. See United States v. Lowden, *infra*; I.C.C. v. R.L.E.A., *infra*.

8. The provisions of each of the collective bargaining agreements, including those relating to seniority acquisitions, by the employees in the craft or class of jobs represented, contain no reference to the race of any of the employees holding such jobs, and are similar to provisions in agreements negotiated and in effect on all other railroads on which each of the defendant unions has representation rights.

9. The evidence of record shows that although the provisions of such agreements are uniform throughout the railroad industry, the racial composition of employees holding the jobs represented by defendant unions varies widely throughout the United States and Canada.

10. The seniority provisions of each of the agreements serve the interests of the individual craft or class of employees represented by each of the defendant unions by restricting seniority acquisitions to the employees in that craft or class. Such agreements uniformly do not permit an employee whose work experience is obtained in one craft or class to carry such seniority into an unrelated position in a different craft or class. See United States by Clark v. H. K. Porter Co., 296 F.Supp. 40, 67 (N.D.Ala.1968).

11. Protection of the seniority rights acquired by Company employees under the craft or class system serves the public interest by aiding the efficient performance of rail transportation. United States v. Lowden, 308 U.S. 225, 232–240, 60 S.Ct. 248, 252–256, 84 L.Ed. 208, 214–218 (1939); see Whitfield v. United Steelworkers of America, Local No. 2708, 263 F.2d 546 (5th Cir. 1959), cert. denied 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254.

12. Job security obtained by employees of the Company under the seniority and other rules and working conditions of employment set forth in the collective bargaining agreements in effect at the Company strengthens the segment of the national system of rail transportation performed by the Company by its beneficial effect on the morale and stability of employment for the employees involved. Interstate Commerce Commission v. Railway Labor Executives Ass'n, 315 U.S. 373, 378, 62 S.Ct. 717, 720, 86 L.Ed. 904, 909 (1942); see Whitfield v. United Steelworkers, etc., *supra*.

13. Craft and class seniority in and of itself does not constitute a racially discriminatory practice, and under the seniority systems in effect at the Company white employees possess no greater rights to transfer from a job in one craft or class to a job in another craft or class than do Negro employees. *Cf.* Quarles v.

Philip Morris, Inc., 279 F.Supp. 505, 508 (E.D.Va.1968); Local 189, United Papermakers, etc. v. United States by Mitchell, 416 F.2d 980, 983 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (Feb. 24, 1970); Miller v. International Paper Co., 408 F.2d 283, 294 (5th Cir. 1969).

14. The interpretation and application of provisions of the craft or class seniority system presently in effect at the Company does not violate Section 703 of the Civil Rights Act of 1964, 42 U.S. C.A. § 2000e–2.

 15. The defendant unions are not found to be engaged in acts and practices which cause or attempt to cause the Company to classify its Negro employees in ways which deprive or tend to deprive these employees of employment opportunities, which limit such employment opportunities, or otherwise adversely affect their status as employees or as applicants for employment because of their race, in violation of Section 703(c) (2) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(c) (2).

16. The collective bargaining agreements of the defendant unions do not perpetuate or tend to perpetuate the effects of any discriminatory acts and practices alleged by the Government to have been engaged in by the Company in violation of the Act. Cf. Local 189, United Papermakers, etc. v. United States by Mitchell, supra; Quarles v. Philip Morris, Inc., supra; United States by Clark v. Hayes International Corp., 295 F.Supp. 803, 808 Note 7 (N.D.Ala.1968).

17. The negotiation of the collective bargaining agreements of the defendant unions with the Company has been undertaken by national and system officers of the international or national labor organizations which are the unions named as defendants in this action, and no local lodge is authorized by the laws of any of such unions to negotiate with respect to the rules, wages and working conditions of any of the employees who are so represented. Cf. Local 189, United Papermakers, etc. v. United States by Mitchell, supra; Quarles v. Philip Morris, Inc., supra.

18. No agreement has been negotiated with the Company by representatives of any of the union defendants which would, or has, restricted the jobs involved to the members of a single race. Cf. Local 189, United Papermakers, etc. v. United States by Mitchell, supra; Quarles v. Philip Morris, Inc., supra.

19. No provision of any of the constitutions and bylaws of the defendant unions denies membership in any of the unions to Negro employees of the Company, and no violation of the Act has been shown to result from the application of such union laws to the employees represented by the unions.

20. The provisions of the agreement between the Shopcrafts Unions and the Company restricting the work of Journeymen mechanics to the holders of such positions, are applicable without regard to the race of the holder of any of such jobs, and serve a useful public purpose in maintenance of safety in rail operations of the Company as concerns the public, the Company, and its other employees. These contract provisions are not shown to be in violation of Section 707 of the Act. See Whitfield v. United Steelworkers, etc., supra.

21. The Court concludes on the basis of all the evidence, and its findings thereon, relating to the establishment, negotiation, and application of the provisions of the seniority systems under agreements between the union defendants and the Company that such seniority systems are bona fide seniority systems within the contemplation of Section 703(h) of the Act, 42 U.S.C.A. § 2000e–2(h), as such section has been interpreted by judicial precedents persuasive to the Court. See Whitfield v. United Steelworkers, etc., supra; cf. Local 189, United Papermakers, etc. v. United States by Mitchell, supra.

 22. The membership of certain employees of the Company who are in separate local lodges of certain of the defendant unions is held not to be an act

or practice in violation of Section 707 of the Act.

23. There was no evidence adduced by the Government relating to the craft or class of employees represented by seven (7) of the defendant unions: The American Railway Supervisors Association, the Transportation Communications Employees Union, the Sheet Metal Workers International Association, the Brotherhood of Railroad Signalmen, the Railroad Yardmasters of America, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, and the International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers.

The provisions of the agreements of these union defendants with the Company are shown not to violate or to cause a violation of Section 707 of the Act, and the Court concludes that the absence of proof as to these union defendants is an additional reason why no relief is appropriate as to these defendants. United States by Clark v. Local 189, United Papermakers, and Paperworkers, etc., 301 F.Supp. 40 (N.D.Ala.1968).
v. Philip Morris, Inc., 279 F.Supp. 505, 508 (E.D.Va.1968).

B. *Conclusions of Law as to Defendant BLE.*

In addition to the foregoing applicable conclusions, the Court makes the following conclusions of law as to the defendant BLE.

1. The Government failed to show, as to defendant BLE, evidence of any present act or repeated instances of acts of intentional discrimination or denial of the full exercise of rights protected by Title VII. The proof of the Government does not arguably even indicate, let alone establish, a general consistent policy or pattern of discrimination embodied in the acts of the BLE or in the collective bargaining agreements of the BLE. The Government's evidence does not meet the required burden of proof of a pattern or practice of discrimination in violation of 42 U.S.C.A. § 2000e et seq. United

States by Clark v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968).

2. The collective bargaining agreements between the BLE and the Company do not limit, segregate or classify employees to give different rights or conditions to different groups of employees on the basis of race and do not provide for any terms, conditions or privileges of employment that discriminate on the basis of race or that deny Negro employees equal employment opportunities. The BLE does not participate, or cooperate with the Company, in maintaining any racially segregated dual system of jobs and lines of progression for the employees of the Company in the engine service crafts represented by the BLE.

3. The craft seniority rules of the BLE collective bargaining agreements do not create, and do not perpetuate or tend to perpetuate the effects of, any racially discriminatory acts and practices. The craft seniority rules of the BLE collective bargaining agreements were not instituted to prevent transfers of Negro employees into engine service crafts and do not impose restrictions or have the effect of imposing restrictions that are different for Negro and white employees. The craft seniority system contained in the collective bargaining agreements for the engine service crafts of locomotive engineer and fireman is required by business necessity, safety and efficiency of operation, as well as employee safety and employee job security, and is not in violation of Section 703 of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2. Rather, the craft seniority system in effect for the engine service crafts is a *bona fide* seniority system within the meaning of Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(h). The Government admits that the provisions as to establishing seniority are and have been applied to white employees and that uniformly, employees who acquired seniority to work in engine service relinquished any other

seniority they may have had at the Company. Such contract provisions and acts and practices, applied equally to employees of all races, do not constitute acts of discrimination or violations of Title VII of the Civil Rights Act of 1964. United States v. Dillon Supply Co., 314 F.Supp. 956 (E.D.N.C.1969). See: Local 189, United Papermakers, etc. v. United States by Mitchell, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (Feb. 24, 1970); Whitfield v. United Steelworkers of America, etc., 263 F.2d 546 (5th Cir. 1959), cert. denied 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959).

4. The collective bargaining provisions relating to promotion examinations given to firemen and hostler helpers to become qualified as hostlers and engineers, are not, in themselves, in their administration, or in action upon their results designed, intended or used to discriminate because of race within the meaning of Section 703(c) and (h) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(c) and (h).

■ 5. The defendant BLE is not engaged in acts and practices which limit, segregate or classify Negro employees of the Company, and does not cause or attempt to cause the Company to discriminate against its Negro employees, in ways which deprive or tend to deprive these employees of employment opportunities or which limit such employment opportunities or otherwise adversely affect their status as employees and as applicants for employment because of their race, in violation of Section 703(c) (2) and (3) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(c) (2) and (3).

6. The acts and practices of the defendant BLE do not constitute a pattern and practice of intentional resistance to the full enjoyment of the right of Negroes to equal employment opportunities, in violation of Section 707 of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000–6.

## JUDGMENT

This action came on for trial before the Court, Honorable Charles R. Scott, District Judge, presiding, without a jury, and the issues having been duly tried, the parties having filed a pretrial stipulation, counsel for all parties having been heard, and the Court having rendered its decision and made its decision and made its findings of fact and conclusions of law; it is

Ordered:

1. That plaintiff, United States of America, take nothing by its suit, and that this action be dismissed, with prejudice, and at the cost of the plaintiff.

2. That defendant, Jacksonville Terminal Company, and defendant unions, shall recover from plaintiff their costs to be hereinafter taxed by the Court.

## ORDER

Ordered:

1. Defendants shall file their praecipe for taxation of costs no later than Monday, May 4, 1970. Plaintiff is allowed until May 13, 1970, to file objections to the praecipe for taxation of costs. Hearing on the taxation of costs is set at 10:00 A. M., Tuesday, May 19, 1970, in Court Room No. 2 at Jacksonville, Florida.

■ 2. That 28 U.S.C. § 2412 is not a statutory prohibition to the awarding of attorneys' fees against the United States, for the reason that Section 706 (k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), specifically provides that the United States may be liable for attorneys' fees, in the discretion of the Court, as part of the costs awarded the prevailing party to the action.

3. The Court, in its discretion, reserves a ruling on defendants' request for attorneys' fees until the time for appeal has expired, or, in the event an appeal is taken, until final determination.